S. Don Bennion, Esq.
Nevada Bar No. 4530
Bradley J. Cline, Esq.
Nevada Bar No. 13673
**LAW OFFICE OF S. DON BENNION**
10801 W. Charleston Blvd, Suite 170
Las Vegas, Nevada 89135
Tel: (702) 333-0777 Fax: (702) 333-0577
email: don@bennionlaw.com
*Attorneys for John M. Berkhoff*

✓ FILED
ENTERED
RECEIVED
SERVED ON
COUNSEL/PARTIES OF RECORD
AUG 17 2015
CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY: DEPUTY

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

JOHN M. BERKHOFF, an individual,

Plaintiff,

v.

ABM SERVICE CORPORATION, a Delaware corporation; HORACE MANN EDUCATORS CORPORATION, an Illinois corporation; HORACE MANN INVESTORS, INC, a Maryland corporation; DOES 1 through 5; and ROE CORPORATIONS I through 5,

Defendants.

2:15-cv-01552

**COMPLAINT FOR DECLARATORY RELIEF, PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF, AND COMPENSATORY AND PUNITIVE DAMAGES**

**DEMAND FOR JURY TRIAL**

COMES NOW the Plaintiff John M. Berkhoff, by and through his counsel S. Don Bennion and Bradley J. Cline and for his Complaint against ABM Service Corporation ("ABM"), Horace Mann Educators Corporation ("HMEC"), and Horace Mann Investors, Inc. ("HMII") (collectively, "Defendants" or "the Horace Mann Companies") sets forth his causes of action, and demands a trial by jury, and does hereby allege as follows:

1. This is a civil action whereby Plaintiff seeks compensatory damages, punitive damages, attorney's fees and costs, Declaratory Relief, and Preliminary and Permanent Injunctive Relief.

2. Plaintiff seeks Preliminary and Permanent Injunctive Relief enjoining Defendants from enforcing the Non-Competition provisions of the parties' contractual agreement(s), which are overbroad, unenforceable, and in violation of the public policy of the State of Nevada.

3. Plaintiff prays for Declaratory Relief to determine the rights of the parties to the contractual agreements described herein.

4. An actual controversy exists between the parties involving Defendants' present intent to restrict the ability of Plaintiff to lawfully compete for insurance customers within the District of Nevada by enforcing Non-Competition provisions which are overbroad, unenforceable, and contrary to public policy in the State of Nevada.

**PARTIES**

5. Plaintiff John M. Berkhoff is a resident of the city of Henderson, Nevada, located in Clark County, Nevada, and Plaintiff is domiciled in the State of Nevada.

6. Defendant HMEC, incorporated in Delaware, and with its principal place of business in Illinois, is an insurance holding company for its insurance subsidiaries.

7. Per Exhibit 21 to HMEC's Form 10-K filed with the Securities and Exchange Commission March 2, 2015 ("2014 10-K"), Defendant HMII is listed in the category of "Other Subsidiaries" of HMEC, and is a Maryland corporation.

8. Per Exhibit 21 to HMEC's 2014 10-K, Defendant ABM is listed in the category of "Other Subsidiaries" of HMEC, and is a Delaware corporation.

9. ABM is a non-operating shell entity created out of subterfuge in an attempt to segregate employees from the operating insurance entities and thereby avoid liability.

10. ABM does not pay Exclusive Agents ("EA"s) compensation from its funds, nor does it pay the compensation of any other employees.

11. The true names and capacities of Defendants named herein as Does 1 through 5, their citizenship and capacities, whether individual, corporate, associate, or otherwise, are unknown to Plaintiff who therefore sues these Defendants by fictitious names. Plaintiff is informed and believes and therefore alleges that each of the Defendants, designated as Does 1 through 5, are or may be, legally responsible for the events referred to in this action and proximately caused damages to Plaintiff as herein alleged, and Plaintiff will ask leave of this Court to amend the Complaint to insert the true names and capacities of such Defendants when they have been determined, and to join them in this action, together with the proper charges and allegations.

12. The true names and capacities of the Defendants named herein as Roe Corporations 1 through 5, inclusive, are unknown to Plaintiff who therefore sues these Defendants by fictitious names. Plaintiff is informed and believes and therefore alleges that each of the Defendants designated as a Roe Corporation Defendant are or may be, legally responsible for the events referred to in this action and proximately caused damages to Plaintiff as herein alleged, and Plaintiff will ask leave of this Court to amend the Complaint to insert the true names and capacities of Roe Corporations 1 through 5, inclusive, when the same have been determined, and to join them in this action, together with the proper charges and allegations.

////

**JURISDICTION AND VENUE**

13. The events and circumstances described in this Complaint substantially took place in the District of Nevada.

14. All of the Defendants in this action are completely diverse from the Plaintiff.

15. The amount in controversy in this case exceeds $75,000, exclusive of interest and costs.

16. This Court has diversity jurisdiction under 28 U.S.C. § 1332.

17. This Court is authorized to grant Declaratory Relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02 implemented through Rule 57 of the Federal Rules of Civil Procedure, and to issue the Injunctive Relief requested by Plaintiff under Rule 65 of the Federal Rules of Civil Procedure.

18. HMEC, ABM, and HMII are subject to personal jurisdiction in the District of Nevada because they performed the unlawful conduct complained of within the District of Nevada, and they each engage in business within the District of Nevada.

19. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial amount of the claims giving rise to the causes of action alleged herein occurred in the District of Nevada.

20. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because all of the named Defendants herein are subject to personal jurisdiction by this Court.

**FACTS COMMON TO ALL CAUSES OF ACTION**

21. From August 25, 2009, and up until the date his contract was breached by Defendants on April 21, 2015, Mr. Berkhoff worked as an EA for the Horace Mann Companies.

22. In his capacity as an EA, Mr. Berkhoff sold insurance and financial products within Clark County, Nevada, through Vegas Valley Insurance and Financial Services LLC ("Vegas Valley Insurance") and Golden Insurance and Financial Services LLC ("Golden Insurance").

23. Vegas Valley Insurance is an active limited liability company organized under the laws of the State of Nevada, and is wholly owned by Mr. Berkhoff.

24. Golden Insurance is a dissolved limited liability company organized under the laws of the State of Nevada, which was wholly owned by Mr. Berkhoff.

25. Mr. Berkhoff performed his duties pursuant to a contract, drafted by Defendants, titled Exclusive Agent ("EA") Agreement.

26. Mr. Berkhoff performed his duties pursuant to an EA Agreement entered into between Mr. Berkhoff and Defendant HMII on August 25, 2009 (the "Vegas Valley EA Agreement") (attached hereto as Exhibit A), and an EA Agreement entered into between Mr. Berkhoff and Defendant ABM on February 22, 2012 (The "Golden EA Agreement") (attached hereto as Exhibit B), (hereafter, the Vegas Valley EA Agreement and the Golden EA Agreement shall be collectively referred to as "the EA Agreement").

**<u>CHOICE OF LAW AND FORUM SELECTION CLAUSE</u>**

27. The Vegas Valley EA Agreement does not contain a forum selection clause.

28. Plaintiff has selected the District of Nevada as his forum for this lawsuit.

29. The District of Nevada is the appropriate forum for this lawsuit because the forum selection clause in Section 20 of the Golden EA Agreement is a permissive forum selection clause, as opposed to a mandatory forum selection clause, pursuant to the holdings

in *Hunt Wesson Foods Inc. v. Supreme Oil Co.*, 817 F.2d 75, 77 (9th Cir. 1987) and *Kachal, Inc. v. Menzie*, 738 F. Supp. 371 (D. Nev. 1990).

**NATURE OF THE CLAIM**

30. Mr. Berkhoff started with HMEC as an employee agent in 2006.

31. In 2009, HMEC employee agents were induced to quit their jobs and encouraged to transition into exclusive agents.

32. This transition had the result of taking away the employee agents' 401ks, profit sharing, group benefits, as well as their employee protections.

33. HMEC replaced these benefits with increased costs, including but not limited to, requiring exclusive agents to purchase: their insurance licenses and renewals, county and state business licenses, errors and omissions insurance, business insurance, workman's compensation, private health care insurance, and staffing payroll.

34. If an agent chose not to transition to an EA, they would lose the stability of their compensation, which would all be based on a previous year's production.

35. Acting in reliance on these inducements and representations made by HMEC, Mr. Berkhoff converted to an Exclusive Agent in 2009.

**The Termination Provisions**

36. Section 15(B) of the Vegas Valley EA Agreement, signed by Mr. Berkhoff on August 25, 2009, states, in relevant part:

> "This Agreement may be terminated:
>
> 1. At any time by mutual agreement of the parties in writing;
> 2. By either party, with or without case, or reason, upon providing sixty (60) days prior written notice to the other, or such greater number of days as is required by applicable law. …
> 3. Alternatively, by the Company, with cause, immediately upon providing written notice to You.

37. Section 16(B) of the Golden EA Agreement, signed by Mr. Berkhoff on February 22, 2012, states, in relevant part:

> "This Agreement may be terminated:
> 1. At any time by mutual agreement of the parties in writing;
> 2. By either party, with or without case, or reason, upon providing sixty (60) days prior written notice to the other, or such greater number of days as is required by applicable law. ...
> 3. Alternatively, by the Company, with cause, immediately upon providing written notice to You."

38. Mr. Berkhoff's insurance appointment with Defendants was terminated on April 21, 2015.

39. Mr. Berkhoff was not provided sixty days prior written notice of this termination.

**<u>Mr. Berkhoff Excelled at his Profession</u>**

40. From 2009-2012, Mr. Berkhoff was a top producer in Nevada in one or more product lines, and from 2009-2010, Mr. Berkhoff was one of the top Horace Mann agents in the nation based on production.

41. Mr. Berkhoff produced stellar results for HMEC, up until the date his insurance appointment was terminated on April 21, 2015.

42. Beginning with the date that Mr. Berkhoff started in 2006, and continuing throughout his career with Horace Mann, he was consistently ranked in the top ten percent of HMEC's agent force, based on production.

43. Over the course of his eight and one-half years with HMEC as an employee and exclusive agent, Mr. Berkhoff received a number of national awards from HMEC.

44. These awards include, but are not limited to: 2007 Auto Rookie of the Year, 2007 Property Rookie of the Year, 2009 & 2010 Inner Circle (top 10 agent in the company), 2009 Life Millionaire, May 2009 Agent of the Month, and 2014 Financial Service Council.

45. Mr. Berkhoff also qualified for HMEC's "Leadership Conferences" every year since 2007.

46. Mr. Berkhoff qualified for the "Presidents Conference" (Top 30 nationwide agents) for three of the years he was associated with Defendants.

47. From 2012 through March 2015, Mr. Berkhoff was the recipient of numerous performance-based, agent sales production awards from HMEC based upon Mr. Berkhoff's annual performance.

48. Mr. Berkhoff received yearly "Top Rewards" for his outstanding performance in his district and region.

49. In 2014, Mr. Berkhoff ranked in the Top 20 of HMEC agents nationwide.

50. Three days after his termination, Mr. Berkhoff received by mail his third consecutive Agency Professional Certification, dated March 15, 2015.

51. This award was given in recognition of Mr. Berkhoff's "dedication to clients, business growth, and commitment to the HMEC Brand Beliefs."

**<u>The Satellite Insurance Agency</u>**

52. Early in 2012, HMEC's management approached Mr. Berkhoff with an opportunity to buy a second insurance business (the "satellite" business) in Mr. Berkhoff's same territory. The satellite business became known as Golden Insurance.

53. Mr. Berkhoff expressed interest in management's proposition, and was particularly interested in buying the satellite book of business in order to merge it into his then-current business (the "primary" business).

54. The primary business continued to be known as Vegas Valley Insurance.

55. It was at the behest of HMEC that Mr. Berkhoff individually purchased the subject satellite agency from a departing HMEC agent in 2012 at a cost of $30,000.

56. In buying the satellite book of business, Mr. Berkhoff was acting in reliance on HMEC's representations that he would generate additional profits.

**<u>Defendants Placed Inordinate and Unwarranted Pressure on Agents</u>**

57. Mr. Berkhoff was also motivated to buy the satellite business in order to replace the business Mr. Berkhoff was losing as a consequence of HMEC's intentional gutting of its casualty line of insurance.

58. Agents and clients suffered from Defendants' multiple rate increases, as well as a lack of ease in doing business, from customer service to claims.

59. HMEC has made compensation changes almost every year since 2009, and agent compensation has been a consistent issue for agents from 2009 through April 2015.

60. Agent support was also an issue during the time that Mr. Berkhoff worked as an EA for HMEC, especially with respect to the computer systems HMEC relied upon in conducting business.

61. HMEC is still operating on a pre-DOS mainframe.

62. To this day, agents cannot make policy changes for clients in their offices. Instead, any requests for policy changes are passed off to HMEC's home office in Illinois, and can take anywhere from 3-7 business days to process.

63. For a fee (paid by agents), HMEC offered a team of specialized customer service representatives resident in the home office, called Premier Service/Advocacy Service. Utilizing this service decreases the amount of processing time required to complete a policy change for client change to 1-2 business days.

64. Between 2010 and 2012, HMEC reported year-over-year losses with respect to revenue derived from new business on its casualty line of insurance.

65. These losses were due to poor or noncompetitive internal pricing and underwriting policies.

66. During this time period, HMEC also raised rates on existing clients, culminating in six rate increases in just five years.

67. Given the competitive nature of casualty insurance pricing, these rate increases represented a punishing proposition for an Exclusive Agent working under HMEC's banner, given that HMEC agents were in turn forced to inform their clients of a rate increase.

68. In two years, HMEC drove off approximately 33% of its casualty business in Nevada.

69. By alienating insurance customers from its casualty business, Defendants breached the implied covenant of good faith and fair dealing with respect to Mr. Berkhoff.

70. HMEC's many changes to its agent compensation made it extremely challenging for Mr. Berkhoff to keep cash flow consistent.

71. With respect to Vegas Valley Insurance and Golden Insurance, HMEC instituted different compensation percentages regarding insurance business generated by Mr. Berkhoff.

72. In certain cases, if Mr. Berkhoff were to place business in one agency as opposed to another, he would only receive one-half of the comparative commission, an amount which was less than what Mr. Berkhoff paid his licensed staff.

73. In effect, were business to be placed in one agency over another, this would cause Mr. Berkhoff to actually lose money when writing the business.

74. Mr. Berkhoff had many discussions about this problem with HMEC management.

75. Defendants' response to Mr. Berkhoff's raising this problem was always the same: "We know" or "We are working on it."

76. Defendants did not do anything to resolve the aforementioned problems.

77. Defendants' inconsistent and overcomplicated compensation structure made it extremely difficult for Mr. Berkhoff to conduct to allocate business between his primary and satellite offices.

**Defendants Allowed Mr. Berkhoff to Allocate Business as He Saw Fit**

78. HMEC approved Mr. Berkhoff's acquisition of the satellite office in March 2012.

79. Both Mr. Berkhoff's primary and satellite agencies were licensed to sell insurance in the State of Nevada, and each operated in the same HMEC-defined sales territory in Clark County, Nevada.

80. Both Mr. Berkhoff's primary and satellite agencies were run out of one location, using the same staff, points of distribution, and meeting space for interaction with clients.

81. HMEC would not allow a merger of Mr. Berkhoff's satellite and primary offices.

82. HMEC made it clear that Mr. Berkhoff would be required to maintain both offices (primary and satellite), and that each office was required to be in a separate location, and utilize separate business phone numbers.

83. Mr. Berkhoff's satellite office was little more than a front, consisting of nothing more than an empty desk with a State of Nevada insurance license hanging on the wall.

84. HMEC did not require Mr. Berkhoff to post business hours at the satellite office.

85. HMEC did not require a separate staff at the satellite office.

86. HMEC did not require client files to be maintained at the satellite office.

87. HMEC did not require Mr. Berkhoff to physically conduct any business whatsoever out of the satellite location.

88. The only requirement demanded of Mr. Berkhoff - as described in the parties' EA Agreement - was to produce a certain amount of business in both the primary and satellite agencies.

89. Mr. Berkhoff primary and satellite businesses were measured by HMEC using a point system.

90. HMEC set the minimum amount of business at 250 "production points."

91. There is not a single provision, sentence, or clause in Mr. Berkhoff's Vegas Valley EA Agreement or Golden EA Agreement that details any instruction on how Mr. Berkhoff is to place insurance business as between his primary and satellite agencies.

92. Mr. Berkhoff operated his agencies in a consistent manner, including the alleged improper allocations cited in the termination letter of April 21, 2015, for over three years without any "cease and desist" orders being issued by HMEC.

93. Mr. Berkhoff was never censured, written up, or made to sign any acknowledgment that his agency allocation practices were improper as between Vegas Valley Insurance and Golden Insurance.

94. Mr. Berkhoff's offices were audited on numerous occasions by his Field Sales Leader ("FSL"), and Mr. Berkhoff was further subjected to internal audits by his Broker/Dealer.

95. Inspections for both the primary and satellite agencies were conducted at Mr. Berkhoff's primary office location - each time, Mr. Berkhoff passed every audit.

96. Despite the fact that the run-down office - consisting of only a desk and a license - was utterly unsuitable for use as a professional office, and even though it had never been used to actually conduct any client business, this satellite office was inspected multiple times and approved as sufficient and compliant by HMEC.

97. In February 2013, Tom Curran, Vice President of Sales at HMEC, sent a general nationwide notice to the sales force instructing agents with satellite offices to place business in the "appropriate" agencies.

98. Immediately after receiving the February correspondence from Mr. Curran, Mr. Berkhoff spoke with Mr. Curran and his FSL, an individual named Hamid Yazarlou.

99. During this 2013 conversation, Mr. Berkhoff once again requested to merge his agencies into one book of business, just as he had originally wanted to do back in 2012

when he was instructed that he had to utilize the satellite program as a separate standalone office.

100. Once again, however, Mr. Berkhoff's request was denied.

101. HMEC management portrayed itself as sympathetic to Mr. Berkhoff's situation and dilemma with respect to the placement of business between his primary and satellite agencies.

102. The response Mr. Berkhoff heard - from 2013 to as recently as February 2015 - was consistent.

103. Mr. Berkhoff was told that HMEC was still "discussing" and "working on" the satellite program, but that it could not allow Mr. Berkhoff to merge his agencies until such time as HMEC came up with a solution.

104. In reliance upon these above-described responses by HMEC, Mr. Berkhoff continued to allocate business between his primary and satellite agencies in the manner to which he had become accustomed.

105. HMEC was putting undue pressure on Mr. Berkhoff by forcing him to artificially balance his production points between two separate agencies.

106. In response, Mr. Berkhoff developed payment allocation procedures with respect to the operation of the Vegas Valley Insurance and Golden Insurance.

107. These payment allocation procedures were ratified by Defendants owing to their failure to object to said payment allocation procedures.

108. Mr. Berkhoff was never informed in any conversation or communication with Defendants that he was at risk of losing his agencies if he proceeded to apply business the way Mr. Berkhoff had transparently been doing between February 2012 and April 2015.

109. This held true, until April 21, 2015, when HMEC pounced on Mr. Berkhoff and stripped him of his agencies and the approximately 1,900 clients that Mr. Berkhoff had developed with his own hard work and sweat equity.

110. By allowing Mr. Berkhoff to "misallocate" insurance business between his primary and satellite agencies for over three years, HMEC's course of conduct demonstrates that HMEC's stated reason for terminating Mr. Berkhoff's insurance appointment on April 21, 2015, was pretextual.

111. The "misallocation" issue that HMEC cited as grounds for Mr. Berkhoff's termination is common practice at HMEC satellite agencies, and specifically satellite agencies that conduct business within the same state as their primary agency.

112. Neither the EA Agreement Mr. Berkhoff signed on behalf of Vegas Valley Insurance in 2009, nor the EA Agreement Mr. Berkhoff signed on behalf of Golden Insurance in 2012, contains any mention of, or direction with respect to, placing business in the "appropriate" agencies.

113. HMEC's termination of Mr. Berkhoff's insurance appointment was discriminatory and pretextual, given that multiple HMEC agents continue to allocate business in substantially the same manner as between their primary and satellite agencies, and yet these agents have not had their insurance appointments terminated.

**<u>Mr. Berkhoff Attempted to Organize a Labor Association of Agents</u>**

114. A significant threat to HMEC is organization of a labor association of agents.

115. The reason a labor association is a threat to HMEC's business model is due to the concentrated nature of HMEC agent's business.

116. The only points of distribution for HMEC are the approximately 700 agencies in the company, 100 of which produce the majority of HMEC's revenues.

117. In the event that HMEC's agents were to engage in collective bargaining, these 100 agents would possess far greater bargaining power than they currently possess.

118. In the event that HMEC's agents were to engage in collective bargaining, HMEC would be unable to pursue the type of action it took against Mr. Berkhoff in this case; namely, appropriating each of his agency's business and client relationships by arbitrarily, pretextually, and wrongfully terminating Mr. Berkhoff's insurance appointment with the Horace Mann Companies.

119. Similarly, were HMEC's agents to unionize, HMEC would be forced to enter into EA agreements which would prevent HMEC from treating its agents as employees, even though they are classified as independent contractors.

120. Because it does not have to bargain with a unionized workforce, HMEC has been free to disregard the importance of its agents over the years, demonstrated through lack of internal investment and ever-changing compensation structure.

121. Given HMEC's condescending and unfair actions towards its agents, Mr. Berkhoff believed that HMEC agents needed a united voice to help speak for agent interests.

122. In the fall of 2014, Mr. Berkhoff, along with two other agents, reached out to NAPAA (National Association of Professional Allstate Agents).

123. NAPAA represents over 1000 Allstate insurance agents, and has operated for over 25 years.

124. A significant percentage of HMEC's management team have experience working at Allstate.

125. A significant amount of the language in the Vegas Valley EA Agreement was taken from, or is substantially similar to, EA agreements utilized by Allstate.

126. Due to the obvious similarities, Mr. Berkhoff and his group of agents felt that NAPAA might be a good fit for helping unite HMEC agents.

127. After a few conversations with Nancy Fish, the Director of NAPAA, she and the Board of Directors agreed to take HMEC agents on as a sub-association until they became big enough to become their own entity.

128. In December 2014, United Horace Mann Agents ("UHMA") was formed.

129. UHMA was designed to be the first step towards unionizing the HMEC agent workforce.

130. UHMA was designed to protect and safeguard the negotiating power and leverage of HMEC agents, given the vastly superior bargaining position HMEC held with respect to its agents, and which resulted in agents being forced into contracts of adhesion such as the EA Agreement.

131. Mr. Berkhoff was intricately involved in the formation of UHMA.

132. The fact that Mr. Berkhoff was involved in the formation of UHMA was known to one or more HMEC officers at the time of the termination of Mr. Berkhoff's insurance appointment.

133. In January 2015, a NAPAA representative named "Greg" appeared at the HMEC kickoff meeting in Dallas, Texas.

134. Greg was distributing literature and speaking to Horace Mann agents about union benefits in the lobby of the hotel where the Horace Mann kickoff meeting was taking place.

135. Upon information and belief, HMEC managers went to the hotel's security force and requested that Greg be removed from the premises.

136. Greg was in fact ordered off the premises by hotel security.

137. In January 2015, UHMA began sending emails to the HMEC sales force to offer membership.

138. In February 2015, UHMA sent out a survey to gauge HMEC agent satisfaction, in order to assist UHMA in focusing on the relevant issues confronting HMEC agents.

139. Out of 650 agents that received the survey, nearly 100 responded.

140. The responses to the survey demonstrated widespread dissatisfaction with HMEC policies and procedures.

141. The results of this survey were released by e-mail from Nancy Fish less than one week before Mr. Berkhoff was terminated.

142. Given this climate, it is clear that HMEC retaliated against Mr. Berkhoff's protected activities in attempting to organize HMEC's labor pool.

**Mr. Berkhoff Discovered a National Compensation Error**

143. In 2014, Mr. Berkhoff stumbled upon a national compensation error that took over 6 months to be acknowledged by HMEC, and another 6 months to be fully corrected, with the final correcting payout occurred in March 2015.

144. Mr. Berkhoff discovered this error in 2013, after noticing that his renewal income was lower than expected, whereupon he brought his concerns to HMEC's compensation department.

145. After receiving an inadequate explanation, Mr. Berkhoff continued to move the concern up through HMEC's management chain until a manager by the name of Kris Anderson found the error.

146. Once uncovered, this compensation error not only affected Mr. Berkhoff, but agents in 16 other states.

147. The error itself was related to a process at HMEC referred to as "Moses." This situation occurred when an auto policy was moved from an old charter, with old rates, into a new charter with better rates. This process was used by HMEC to retain clients who were upset with their rate and potentially looking to take their business elsewhere. When these clients policies were moved, HMEC's system did not generate a commission, given that the policy was categorized as existing business.

148. HMEC agents' commissions were negatively and improperly impacted, however, because to the system these transferred policies appeared as "new" policies, with the result that HMEC's system did not generate a renewal stream for the first year. In short, any policy subject to "Moses" did not generate a renewal, which in turn meant that the agent who was supposed to be earning a commission on the renewal did not get paid properly.

149. It took another several months for the company to audit Mr. Berkhoff's book, as well as the books of the other affected agents.

150. HMEC then took additional time to create a programmable fix to make sure the system did not continue to reproduce this error.

151. In December 2014, HMEC paid Mr. Berkhoff a chunk of what was owed, but still did not fully correct the error, including paying agents their proper compensation, until March 2015.

152. HMEC did not pay any interest on the unpaid commissions, despite the fact that HMEC acknowledged that there was a problem and that agents were in fact owed money.

**Mr. Berkhoff Blows the Whistle**

153. HMEC was also displeased with Mr. Berkhoff's whistleblowing activities.

154. HMEC allows its agents to write business with American Funds, Fidelity, Lincoln Financial and Ameritas, so that its agents can theoretically offer most every product that a prospective client might need. This gives the impression of a company trying to encourage suitable financial recommendations and choices.

155. For a number of years, however, HMEC has been stripping away the compensation and points that agents need to keep earning business cash flow from these partner companies.

156. On top of taking a large portion of agent commissions for writing business with third party vendors - thus making it far less lucrative to place business outside of HMEC - HMEC removed all production point credit for partner companies in 2015.

157. This means that any business written with third party companies would not help satisfy any of the point targets which a given HMEC agent needs to keep its business cash flow at the same level.

158. Throughout, 2014 and 2015, Mr. Berkhoff expressed serious concerns with the aforesaid HMEC agent compensation and how the same affects the recommendations that agents make when it comes to financial service products, and expressed these concerns to outside agencies, including, but not limited to, NAPAA.

////

////

**Mr. Berkhoff is Terminated**

159. On the morning of April 21, 2015, Mr. Berkhoff's FSL Hamid Yazarlou met with Mr. Berkhoff at the primary agency, and presented him with a letter, dated April 21, 2015, on Horace Mann letterhead from Susan J. Royal, Vice President, Marketing Administration, the Horace Mann Companies.

160. The following individuals were cc'd on this letter: Steve Cardinal, Tom Curran, Tom Patrick, Kristen Baum, Norm Sherman, Hamid Yazarlou.

161. This letter informed Mr. Berkhoff "of the immediate termination of your Exclusive Agent (EA) agreement with ABM Service Corporation (ABMSC) for both Vegas Valley Insurance and Golden Fin & Fin Services. The termination of both agencies is effective today, April 21, 2015."

162. Mr. Berkhoff was not provided 60 days notice of this termination.

163. Mr. Berkhoff was ordered, *inter alia*, to dissociate his primary and satellite agencies from HMEC and to cease and terminate all insurance business conducted on behalf of HMEC.

164. Mr. Berkhoff was immediately locked out from the HMEC computer network, and was prevented and precluded from contacting and/or maintaining access to his clients' file materials, contact information, and policy data.

**The EA Agreement Non-Competition Provisions**

165. Section 16(C) of the Vegas Valley EA Agreement states as follows:

> "For a period of twelve (12) months following termination, for any reason, You agree You will not solicit the purchase of products or services in competition with those sold by Horace Mann:
>
> 1. With respect to any person, company or organization to whom You or anyone acting on Your behalf sold insurance or other products or services on behalf of Horace Mann or a Partnering Company and who is a

customer of Horace Mann or a partnering Company at the time of Your termination,

2. With respect to any person, company or organization who is a customer of Horace Mann or a Partnering Company at the time of termination of this Agreement and whose identity was discovered by You as a result of Your status as a Horace Mann agent or as a result of Your access to Confidential Information of Horace Mann, or

3. From any office or business site located within ten miles of any locations from which You solicited or sold Horace Mann or Partnering Companies' products or services during the year immediately preceding termination of this Agreement."

166. Section 17(D) of the Golden EA Agreement states as follows:

"For a period of twelve (12) months following termination, for any reason, You agree You will not solicit the purchase of products or services in competition with those sold by Horace Mann:

1. With respect to any person, company or organization to whom You or anyone acting on Your behalf sold insurance or other products or services on behalf of Horace Mann or an authorized third-party vendor and who is a customer of Horace Mann or an authorized third-party vendor at the time of Your termination,

2. With respect to any person, company or organization who is a customer of Horace Mann or an authorized third-party vendor at the time of termination of this Agreement and whose identity was discovered by You as a result of Your status as an EA or as a result of Your access to Confidential Information. From any office or business site located within ten miles of any locations from which You solicited or sold Horace Mann or authorized third-party vendor's products or services during the year immediately preceding termination of this Agreement."

167. Mr. Berkhoff's termination of his insurance appointment with HMEC occurred on April 21, 2015, and the above-stated provisions ostensibly came into force at that time.

168. Overnight, Mr. Berkhoff was barred from speaking with any of his approximate 1,900 clients, the servicing of each which had contributed to the awards and commendations that HMEC routinely bestowed upon Mr. Berkhoff through March 2015.

169. In addition, Mr. Berkhoff has supposedly been barred from selling insurance at any location in the Las Vegas valley within a ten-mile radius of any point at which Mr. Berkhoff ever sold or solicited insurance.

170. Taken literally, the above Non-Competition provisions purport to prevent Mr. Berkhoff from pursuing his livelihood in the entire municipality of Las Vegas, home to some two million people, given that most if not all locations of a given Clark County school may be found within a ten-mile radius of some geographical location where Mr. Berkhoff once sold or solicited insurance products on behalf of HMEC.

**<u>Defendants File A Form U-5 Complaint</u>**

171. Subsequent to this termination, on April 24, 2015, HMEC filed a Form U-5 "Uniform Termination Notice for Securities Industry Registration" regarding Mr. Berkhoff's FINRA registration status with HMEC Investors, Inc., due to HMEC's "termination" of Mr. Berkhoff.

172. HMEC's "termination explanation" states that Mr. Berkhoff was terminated owing to "affiliated insurance company's lack of trust in part to agent's failure to apply business to the correct sales location, after being informed to cease and desist, for the purpose of maximizing compensation."

173. Mr. Berkhoff was never told to "cease and desist" with regard to how he applied business between his primary and satellite agencies by HMEC as claimed in the U-5 termination notice.

174. In fact, subsequent to Mr. Berkhoff's purchase of the satellite agency, Mr. Berkhoff worked closely with HMEC in complying with and coordinating the approved application of business between his primary and satellite agencies in accordance with the authorization of HMEC.

////

////

**Defendants Fail to Pay Proper Termination Payment Provision Amounts**

175. Following the termination of his insurance appointment on April 21, 2015, Defendants communicated to Mr. Berkhoff in writing on multiple occasions that they would continue to pay monies to Mr. Berkhoff pursuant to a Termination Payment Provision ("TPP") clause in the EA Agreement.

176. Mr. Berkhoff received two direct deposit payments of TPP monies in July and August 2015.

177. The July and August 2015 TPP payments each reflect a failure by Defendants to pay the proper TPP amounts that they are contractually obligated to pay to Mr. Berkhoff.

178. The TPP amounts that Defendants stated they would provide to Mr. Berkhoff in one or more of their written correspondence(s) with Mr. Berkhoff do not match up with the two direct deposit TPP payments that Defendants actually made to Mr. Berkhoff's account in July and August of 2015.

**FIRST CAUSE OF ACTION**

**BREACH OF CONTRACT**

179. As a first, separate, and distinct cause of action, Plaintiff complains against Defendants, and realleges all the allegations contained in the Complaint, and incorporates them by reference into this cause of action as though fully set forth herein.

180. In his capacity as an EA for HMEC, Mr. Berkhoff sold insurance and financial products within Clark County, Nevada, through Vegas Valley Insurance and Golden Insurance.

181. Mr. Berkhoff performed such duties pursuant to the Vegas Valley EA Agreement, entered into between Mr. Berkhoff and HMEC Investors, Inc. on August, 25,

2009, and the Golden EA Agreement, entered into between Mr. Berkhoff and ABM on February 22, 2012 (collectively, "the EA Agreement").

182. From August 25, 2009, Mr. Berkhoff worked as an EA for HMEC and its related subsidiaries, and duly performed all of the conditions of the aforementioned EA Agreement to be performed by Plaintiff until prevented from doing so by Defendants' unlawful termination of Mr. Berkhoff's EA Agreement on April 21, 2015.

183. At the time of the termination of Plaintiff's EA Agreement, Mr. Berkhoff was ready, willing, and able to perform all of the conditions of the EA Agreement which were required to be performed by Plaintiff.

184. On or about April 21, 2015, Defendants breached the EA Agreement by terminating Plaintiff for false, pretextual and defamatory reasons in retaliation for Plaintiff's complaints to persons inside and outside of HMEC and its affiliated companies, and in retaliation for Plaintiff's efforts to organize the labor force of HMEC agents, efforts which were known to one or more of HMEC's corporate officers at the time immediately preceding the unlawful termination.

185. As a pretext for the aforementioned termination of Plaintiff's EA Agreement and insurance appointment, HMEC claimed that the termination was due to Mr. Berkhoff's "repeated disregard for proper business placement," despite the fact that the phrase "proper business placement" does not appear in Mr. Berkhoff's EA Agreement, and despite the fact that numerous other HMEC agents nationwide who are in possession of satellite and primary offices have engaged, and continue to engage in, substantially the same allocation methods undertaken by Mr. Berkhoff, and said agents have not had their insurance appointments terminated.

186. On or about April 21, 2015, Defendants breached Section 15(B) of the Vegas Valley EA Agreement, by purporting to terminate Mr. Berkhoff's insurance appointment for cause, when in fact he was fired for the pretextual and retaliatory reasons described above.

187. On or about April 21, 2015, Defendants breached Section 15(B) of the Vegas Valley EA Agreement, by not providing Mr. Berkhoff with sixty days notice of his termination.

188. On or about April 21, 2015, Defendants breached Section 16(B) of the Golden EA Agreement, by purporting to terminate Mr. Berkhoff's insurance appointment for cause, when in fact he was fired for the pretextual and retaliatory reasons described above.

189. On or about April 21, 2015, Defendants breached Section 16(B) of the Golden EA Agreement, by not providing Mr. Berkhoff with sixty days notice of his termination.

190. Following the termination of his insurance appointment on April 21, 2015, Mr. Berkhoff received two direct deposit payments of TPP monies in July and August of 2015, each of which reflect a failure by Defendants to pay the proper TPP amounts that they are contractually obligated to pay to Mr. Berkhoff.

191. Defendants' failure to pay the TPP amounts that they are contractually obligated to pay to Mr. Berkhoff constitutes a breach of the EA Agreement.

192. As a direct and proximate result of Defendants' breach of the EA Agreement, Plaintiff has suffered and continues to suffer substantial economic losses in the form of current and future earnings, as well as TPP amounts, all of which Plaintiff would have received had Defendants not breached the EA Agreement.

193. As a direct and proximate result of Defendants' breach of the EA Agreement, Plaintiff has suffered from the forced removal of approximately 1,900 clients from Vegas

Valley Insurance's and Golden Insurance's insurance rolls, all to Plaintiff's economic, emotional, special, and general damage according to proof at the time of trial.

194. Plaintiff seeks damages for the aforementioned injuries which exceed the jurisdictional limits of this Court and will be established according to proof at trial.

195. It has been necessary for Plaintiff to retain legal counsel through the Law Office of S. Don Bennion, and Plaintiff has sustained damages in the form of attorney's fees and costs to prosecute this action, which damages Plaintiff is entitled to recover as a matter of law.

WHEREFORE, Plaintiff requests relief as hereinafter provided.

**SECOND CAUSE OF ACTION**

**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING – CONTRACTUAL BREACH**

196. As a second, separate, and distinct cause, Plaintiff complains against Defendants, and realleges all the allegations contained in the Complaint, and incorporates them by reference into this cause of action as though fully set forth herein.

197. In the State of Nevada, there exists in law and all contracts an implied covenant of good faith and fair dealing.

198. Plaintiff entered into the Vegas Valley EA Agreement and the Golden EA Agreement with one or more Defendants, and each of these contracts contains an implied covenant of good faith and fair dealing.

199. On or about April 21, 2015, Defendants breached the implied covenant of good faith and fair dealing of the EA Agreement by terminating Plaintiff for false, pretextual and defamatory reasons in retaliation for Plaintiff's complaints to persons inside and outside of HMEC and its affiliated companies, and in retaliation for Plaintiff's efforts to organize the

labor force of HMEC agents, efforts which were known to one or more of HMEC's corporate officers at the time immediately preceding the unlawful termination.

200. As a pretext for the aforementioned termination of Plaintiff's EA Agreement and insurance appointment, HMEC claimed that the termination was due to Mr. Berkhoff's "repeated disregard for proper business placement," despite the fact that the phrase "proper business placement" does not appear in Mr. Berkhoff's EA Agreement, and despite the fact that numerous other HMEC agents nationwide who are in possession of satellite and primary offices have engaged, and continue to engage in, substantially the same allocation methods undertaken by Mr. Berkhoff, and said agents have not had their insurance appointments terminated.

201. Following the termination of his insurance appointment on April 21, 2015, Mr. Berkhoff received two direct deposit payments of TPP monies in July and August of 2015, each of which reflect a failure by Defendants to pay the proper TPP amounts that they are contractually obligated to pay to Mr. Berkhoff.

202. Defendants' failure to pay the TPP amounts that they are contractually obligated to pay to Mr. Berkhoff constitutes a contractual breach of the implied duties of good faith and fair dealing.

203. As a direct and proximate result of Defendants' breach of the implied covenant of good faith and fair dealing, Plaintiff has suffered and continues to suffer substantial economic losses in the form of current and future earnings, as well as TPP payments, all of which Plaintiff would have received had Defendants not contractually breached the implied covenant of good faith and fair dealing.

204. As a direct and proximate result of Defendants' breach of the implied covenant of good faith and fair dealing, Plaintiff has suffered from the forced removal of approximately 1,900 clients from Vegas Valley Insurance's and Golden Insurance's insurance rolls, all to Plaintiff's economic, emotional, special, and general damage according to proof at the time of trial.

205. Plaintiff seeks damages for the aforementioned injuries which exceed the jurisdictional limits of this Court and will be established according to proof at trial.

206. It has been necessary for Plaintiff to retain legal counsel through the Law Office of S. Don Bennion, and Plaintiff has sustained damages in the form of attorney's fees and costs to prosecute this action, which damages Plaintiff is entitled to recover as a matter of law.

WHEREFORE, Plaintiff requests relief as hereinafter provided.

## THIRD CAUSE OF ACTION

## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING - TORTIOUS BREACH

207. As a third, separate, and distinct cause, Plaintiff complains against Defendants, and realleges all the allegations contained in the Complaint, and incorporates them by reference into this cause of action as though fully set forth herein.

208. In the State of Nevada, there exists in law and all contracts an implied covenant of good faith and fair dealing.

209. Plaintiff entered into the Vegas Valley EA Agreement and the Golden EA Agreement with one or more Defendants, and each of these contracts contains an implied covenant of good faith and fair dealing.

210. Nevada law provides for damages incurred as a result of a tortious breach implied covenant of good faith and fair dealing.

211. By granting Mr. Berkhoff an insurance appointment, Defendants had control over Mr. Berkhoff's ability sell insurance to his clients, as well as over Mr. Berkhoff's contractual compensation, which created a special element of reliance or fiduciary duty between Mr. Berkhoff and Defendants, the breach of which gives rise to tortious breach.

212. On or about April 21, 2015, Defendants breached the implied covenant of good faith and fair dealing of the EA Agreement by terminating Plaintiff for false, pretextual and defamatory reasons in retaliation for Plaintiff's complaints to persons inside and outside of HMEC and its affiliated companies, and in retaliation for Plaintiff's efforts to organize the labor force of HMEC agents, efforts which were known to one or more of HMEC's corporate officers at the time immediately preceding the unlawful termination.

213. As a pretext for the aforementioned termination of Plaintiff's EA Agreement and insurance appointment, HMEC claimed that the termination was due to Mr. Berkhoff's "repeated disregard for proper business placement," despite the fact that the phrase "proper business placement" does not appear in Mr. Berkhoff's EA Agreement, and despite the fact that numerous other HMEC agents nationwide who are in possession of satellite and primary offices have engaged, and continue to engage in, substantially the same allocation methods undertaken by Mr. Berkhoff, and said agents have not had their insurance appointments terminated.

214. Following the termination of his insurance appointment on April 21, 2015, Mr. Berkhoff received two direct deposit payments of TPP monies in July and August of 2015,

each of which reflect a failure by Defendants to pay the proper TPP amounts that they are contractually obligated to pay to Mr. Berkhoff.

215. Defendants' failure to pay the TPP amounts that they are contractually obligated to pay to Mr. Berkhoff constitutes a tortious breach of the implied duties of good faith and fair dealing.

216. As a direct and proximate result of Defendants tortious breach of the implied covenant of good faith and fair dealing, Plaintiff has suffered and continues to suffer substantial economic losses in the form of current and future earnings, as well as TPP payments, all of which Plaintiff would have received had Defendants not tortiously breached the implied covenant of good faith and fair dealing.

217. As a direct and proximate result of Defendants' breach of the implied covenant of good faith and fair dealing, Plaintiff has suffered from the forced removal of approximately 1,900 clients from Vegas Valley Insurance's and Golden Insurance's insurance rolls, all to Plaintiff's economic, emotional, special, and general damage according to proof at the time of trial.

218. Plaintiff seeks damages for the aforementioned injuries which exceed the jurisdictional limits of this Court and will be established according to proof at trial.

219. It has been necessary for Plaintiff to retain legal counsel through the Law Office of S. Don Bennion, and Plaintiff has sustained damages in the form of attorney's fees and costs to prosecute this action, which damages Plaintiff is entitled to recover as a matter of law.

WHEREFORE, Plaintiff requests relief as hereinafter provided.

////

## FOURTH CAUSE OF ACTION

## UNJUST ENRICHMENT

220. As a fourth, separate, and distinct cause of action, Plaintiff complains against Defendants, and realleges all the allegations contained in the Complaint, and incorporates them by reference into this cause of action as though fully set forth herein.

221. Through their breach of contract, breach of the implied covenants of good faith and fair dealing, violations of public policy, and fraudulent misrepresentations, Defendants received a benefit from Plaintiff, including, but not limited to, the appropriation of approximately 1,900 clients from Vegas Valley Insurance's and Golden Insurance's insurance rolls, whereupon such clients and their continuing commissions were transferred to Defendant(s) for their benefit.

222. Defendants improperly, and without consent by Plaintiff, retained control over these client relationships and the continuing commissions derived therefrom.

223. Defendants were not entitled to wrest control over these client relationships and the continuing commissions derived therefrom from Plaintiff.

224. Defendants had, and have, no legitimate entitlement to control over these client relationships and the continuing commissions derived therefrom.

225. Upon information and belief, Defendants have continued to use the illgotten client relationships and the continuing commissions derived therefrom for their own benefit.

226. The taking and retention of these benefits is both inequitable and unjust.

227. By virtue of its acts as described herein, and especially Defendants' forced removal of approximately 1,900 clients from Vegas Valley Insurance's and Golden

Insurance's insurance rolls, whereupon such clients and their continuing commissions were transferred to Defendant(s) for its benefit, Defendants have been unjustly enriched

228. As a direct and proximate result of Defendants' unjust enrichment, Plaintiff has suffered substantial damages.

229. Plaintiff seeks damages for the aforementioned injuries which exceed the jurisdictional limits of this Court and will be established according to proof at trial.

230. It has been necessary for Plaintiff to retain legal counsel through the Law Office of S. Don Bennion, and Plaintiff has sustained damages in the form of attorney's fees and costs to prosecute this action, which damages Plaintiff is entitled to recover as a matter of law.

WHEREFORE, Plaintiff requests relief as hereinafter provided.

## **FIFTH CAUSE OF ACTION**

## **WHISTLEBLOWER RETALIATION**

231. As a fifth, separate, and distinct cause of action, Plaintiff complains against Defendants, and realleges all the allegations contained in the Complaint, and incorporates them by reference into this cause of action as though fully set forth herein.

232. In the fall of 2014, Mr. Berkhoff, along with two other agents, reached out to NAPAA (National Association of Professional Allstate Agents).

233. After a few conversations with Nancy Fish, the Director of NAPAA, she and the Board of Directors agreed to take HMEC agents on as a sub-association until they became big enough to become their own entity.

234. In December 2014, UHMA was formed, and in January 2015, UHMA began sending emails to the HMEC sales force to offer membership.

235. In February 2015, UHMA sent out a survey to gauge HMEC agent satisfaction, in order to assist UHMA in focusing on the relevant issues confronting HMEC agents. Out of 650 agents that received the survey, nearly 100 responded, demonstrating widespread dissatisfaction with HMEC policies and procedures.

236. The results of this survey were released less than a week before Mr. Berkhoff was terminated.

237. Mr. Berkhoff's activities in attempting to organize HMEC's labor pool are protected under federal law and Nevada law.

238. HMEC retaliated against Mr. Berkhoff's protected activities in attempting to organize HMEC's labor pool.

239. As a pretext for the aforementioned termination of Plaintiff's EA Agreement and insurance appointment, and to hide their retaliation against Mr. Berkhoff's attempts to organize HMEC's labor pool, HMEC claimed that the termination was due to Mr. Berkhoff's "repeated disregard for proper business placement," despite the fact that the phrase "proper business placement" does not appear in Mr. Berkhoff's EA Agreement, and despite the fact that numerous other HMEC agents nationwide who are in possession of satellite and primary offices have engaged, and continue to engage in, substantially the same allocation methods undertaken by Mr. Berkhoff, and said agents have not had their insurance appointments terminated.

240. Notwithstanding this pretextual claim, Defendants, on or about April 21, 2015, terminated Plaintiff's EA Agreement and insurance appointment with HMEC in retaliation for Mr. Berkhoff's attempts to organize HMEC's labor pool, and in retaliation for Mr.

Berkhoff's Whistleblowing activities in voicing his concerns regarding HMEC's business practices to outside agencies, including, but not limited to, NAPAA.

241. As a direct and proximate result of this wrongful termination for his Whistleblowing activities, Plaintiff has suffered from the forced removal of approximately 1,900 clients from Vegas Valley Insurance's and Golden Insurance's insurance rolls, all to Plaintiff's economic, emotional, special, and general damage according to proof at the time of trial.

242. As a proximate result of this wrongful termination for his Whistleblowing activities, Plaintiff was caused to suffer, and continues to suffer, from embarrassment, humiliation, severe emotional distress, shunning, anxiety, anguish, fear, loss of capacity to garner future insurance appointments with other companies, employability, and significant economic loss in the form of current and future earnings, as well as the forced removal of approximately 1,900 clients from Vegas Valley Insurance's and Golden Insurance's insurance rolls, all to Plaintiff's economic, emotional, special, and general damage according to proof at the time of trial.

243. Defendants did the things hereinabove alleged, intentionally, oppressively, and maliciously with an evil and malevolent motive to injure Plaintiff. These acts were obnoxious, despicable, and ought not to be suffered by any member of the community.

244. All actions of Defendants, their employees and agents, and each of them as herein alleged, were known, ratified and approved by the officers or managing agents of Defendants, and each of them. Therefore, Plaintiff is entitled to punitive or exemplary damages against Defendants, in an amount to be determined at the time of trial.

245. It has been necessary for Plaintiff to retain legal counsel through the Law Office of S. Don Bennion, and Plaintiff has sustained damages in the form of attorney's fees and costs to prosecute this action, which damages Plaintiff is entitled to recover as a matter of law.

WHEREFORE, Plaintiff requests relief as hereinafter provided.

## SIXTH CAUSE OF ACTION

## DEFAMATION

246. As a sixth, separate, and distinct cause of action, Plaintiff complains against Defendants, and realleges all the allegations contained in the Complaint, and incorporates them by reference into this cause of action as though fully set forth herein.

247. Plaintiff is informed and believes Defendants, and each of them, by the herein-described acts, conspired to, and in fact, did negligently, recklessly, and intentionally caused excessive and unsolicited internal and external publications of defamation, of and concerning Plaintiff, to third persons, the community, and to professional organizations and regulators, including the Financial Industry Regulatory Authority ("FINRA"), and the Nevada Department of Insurance.

248. These false and defamatory statements included express and implied: accusations that Plaintiff violated company policies; that Plaintiff misallocated business in derogation of his EA Agreement; that Plaintiff intentionally failed to meet his obligations under the EA Agreement; that Plaintiff deserved disciplinary action, up to and including termination of his insurance appointment; that Plaintiff lacked integrity; that Plaintiff was a troublemaker; and that Plaintiff lacked professionalism.

249. These and other similar false statements expressly and impliedly stated that Plaintiff was dishonest, was incompetent, lacked professionalism, and was a rabble rouser.

250. Defendants' submission to FINRA of the U-5 allegations against Mr. Berkhoff as described herein took place subsequent to Mr. Berkhoff's termination on or about April 24, 2015.

251. HMEC's defamatory U-5 is but one of the procedural devices which HMEC has engineered to accomplish its defamatory purpose. This publication in particular was outrageous, negligent, reckless, intentional, and maliciously published and republished by Defendants, and each of them.

252. HMEC intends to prevent Mr. Berkhoff from lawfully competing with HMEC in the insurance business by defaming his reputation and stripping him of his client base.

253. Plaintiff is informed and believes that the negligent, reckless, and intentional publications by Defendants, and each of them, were and continue to be, foreseeably published and republished by Defendants, their agents and employees, recipients, in the community. Plaintiff hereby seeks damages for these publications and all foreseeable republications discovered up to the time of trial.

254. During the above-described time-frame, Defendants, and each of them, conspired to, and in fact, did negligently, recklessly, and intentionally cause excessive and unsolicited publication of defamation, of and concerning Plaintiff, to third persons, who had no need or desire to know.

255. Those third person(s) to whom these Defendants published this defamation are believed to include, but are not limited to, other agents and employees of Defendants, and

each of them, and the community, all of whom are known to Defendants, and each of them, but unknown at this time to Plaintiff.

256. The defamatory publications consisted of oral and written, knowingly false and unprivileged communications, tending directly to injure Plaintiff and Plaintiff's personal, business, and professional reputation.

257. Plaintiff is informed, believes and fears that these false and defamatory per se statements will continue to be published by Defendants, and each of them, and will be foreseeably republished by their recipients, all to the ongoing harm and injury to Plaintiff's business, professional, and personal reputations. Plaintiff also seeks redress in this action for all foreseeable republications, including his own compelled self-publication of these defamatory statements.

258. The defamatory meaning of all of the above-described false and defamatory statements and their reference to Plaintiff, were understood by these above-referenced third person recipients and other members of the community who are known to Defendants, and each of them, but unknown to Plaintiff at this time.

259. None of Defendants' defamatory publications against Plaintiff referenced above are true.

260. The above defamatory statements were understood as assertions of fact, and not as opinion. Plaintiff is informed and believes this defamation will continue to be negligently, recklessly, and intentionally published and foreseeably republished by Defendants, and each of them, and foreseeably republished by recipients of Defendants' publications, thereby causing additional injury and damages for which Plaintiff seeks redress by this action.

261. Each of these false defamatory per se publications (as set forth above) were negligently, recklessly, and intentionally published in a manner equaling malice and abuse of any alleged conditional privilege (which Plaintiff denies existed), since the publications, and each of them, were made with hatred, ill will, and an intent to vex, harass, annoy, and injure Plaintiff in order to justify the illegal and cruel actions of Defendants, and each of them, to cause further damage to Plaintiff's professional and personal reputation, to cause his insurance appointment to be terminated, and to retaliate against Plaintiff for prior ill will, rivalry, and disputes in retaliation for his objections to misguided company policies and his attempts to organize the labor force.

262. Each of these publications by Defendants, and each of them, were made with knowledge that no investigation supported the unsubstantiated and obviously false statements. The Defendants published these statements knowing them to be false, and unsubstantiated by any reasonable investigation.

263. These acts of publication were known by Defendants, and each of them, to be negligent to such a degree as to be reckless. In fact, not only did Defendants, and each of them, have no reasonable basis to believe these statements, but they also had no belief in the truth of these statements, and in fact knew the statements to be false. Defendants, and each of them, excessively, negligently, and recklessly published these statements to individuals with no need to know, and who made no inquiry, and who had a mere general or idle curiosity of this information.

264. The above complained-of publications by Defendants, and each of them, were made with hatred and ill will towards Plaintiff and the design and intent to injure Plaintiff, Plaintiff's good name, his reputation, and employability. Defendants, and each of them,

published these statements, not with an intent to protect any interest intended to be protected by any privilege, but with negligence, recklessness and/or an intent to injure Plaintiff and destroy his reputation. Therefore, no privilege existed to protect any of the Defendants from liability for any of these aforementioned publications or republications.

265. As a proximate result of the publication and republication of these defamatory statements by Defendants, and each of them, Plaintiff has suffered injury to his personal, business and professional reputation including suffering embarrassment, humiliation, severe emotional distress, shunning, anxiety, anguish, fear, loss of capacity to garner future insurance appointments with other companies, employability, and significant economic loss in the form of current and future earnings, as well as the forced removal of approximately 1,900 clients from Vegas Valley Insurance's and Golden Insurance's insurance rolls, all to Plaintiff's economic, emotional, special, and general damage according to proof at the time of trial.

266. Defendants, and each of them, committed the acts alleged herein recklessly, maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Plaintiff, for an improper and evil motive amounting to malice in fact (as described above), and which abused and/or prevented the existence of any conditional privilege, which in fact did not exist, and with a reckless and conscious disregard of Plaintiff's rights.

267. All actions of Defendants, and each of them, their agents and employees, herein alleged were known, ratified and approved by the Defendants, and each of them. Plaintiff thus is entitled to recover punitive and exemplary damages from Defendants, and each of them, for these wanton, obnoxious, and despicable acts in an amount based on the wealth and ability to pay according to proof at time of trial.

268. It has been necessary for Plaintiff to retain legal counsel through the Law Office of S. Don Bennion, and Plaintiff has sustained damages in the form of attorney's fees and costs to prosecute this action, which damages Plaintiff is entitled to recover as a matter of law.

WHEREFORE, Plaintiff requests relief as hereinafter provided.

## SEVENTH CAUSE OF ACTION

## WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

269. As a seventh separate, and distinct cause of action, Plaintiff complains against Defendants, and realleges all the allegations contained in the Complaint, and incorporates them by reference into this cause of action as though fully set forth herein.

270. Plaintiff complains against Defendants, and realleges all the allegations contained in the Complaint, and incorporates them by reference into this cause of action as though fully set forth herein.

271. Defendants, on or about April 21, 2015, terminated Plaintiff's EA Agreement and insurance appointment with HMEC in retaliation for Plaintiff's complaints to persons inside and outside of HMEC and its affiliated companies, and in retaliation for Plaintiff's efforts to organize the labor force of HMEC agents, efforts which were known to one or more of HMEC's corporate officers at the time immediately preceding the unlawful termination.

272. As a pretext for the aforementioned termination of Plaintiff's EA Agreement and insurance appointment, HMEC claimed that the termination was due to Mr. Berkhoff's "repeated disregard for proper business placement," despite the fact that the phrase "proper business placement" does not appear in Mr. Berkhoff's EA Agreement, and despite the fact that numerous other HMEC agents nationwide who are in possession of satellite and primary

offices have engaged, and continue to engage in, substantially the same allocation methods undertaken by Mr. Berkhoff, and said agents have not had their insurance appointments terminated.

273. Notwithstanding this pretextual claim, Defendants, on or about April 21, 2015, terminated Plaintiff's EA Agreement and insurance appointment with HMEC in retaliation for Plaintiff's complaints to persons inside and outside of HMEC and its affiliated companies, both with respect to violations of HMEC's policies and compensation practices, as well as with respect to matters concerning public policy.

274. HMEC encouraged Mr. Berkhoff, as well as other agents to sell insurance products which were not appropriate for the client's needs as a result of HMEC setting a commission structure which discouraged agents from offering 3rd party insurance products, even where such products were more suitable for the client's needs.

275. Notwithstanding this pretextual claim, Defendants, on or about April 21, 2015, terminated Plaintiff's EA Agreement and insurance appointment with HMEC in retaliation for Plaintiff's efforts to organize the labor force of HMEC agents, efforts which were known to one or more of HMEC's corporate officers at the time immediately preceding the unlawful termination.

276. As a proximate result of this wrongful termination in violation of public policy, Plaintiff was caused to suffer, and continues to suffer, from embarrassment, humiliation, severe emotional distress, shunning, anxiety, anguish, fear, loss of capacity to garner future insurance appointments with other companies, employability, and significant economic loss in the form of current and future earnings, as well as the forced removal of approximately 1,900 clients from Vegas Valley Insurance's and Golden Insurance's insurance rolls, all to

Plaintiff's economic, emotional, special, and general damage according to proof at the time of trial.

277. Defendants did the things hereinabove alleged, intentionally, oppressively, and maliciously with an evil and malevolent motive to injure Plaintiff. These acts, which resulted in the wrongful termination of Plaintiff's insurance appointment against public policy, were obnoxious, despicable, and ought not to be suffered by any member of the community.

278. All actions of Defendants, their employees and agents, and each of them as herein alleged, were known, ratified and approved by the officers or managing agents of Defendants, and each of them. Therefore, Plaintiff is entitled to punitive or exemplary damages against Defendants, in an amount to be determined at the time of trial.

279. It has been necessary for Plaintiff to retain legal counsel through the Law Office of S. Don Bennion, and Plaintiff has sustained damages in the form of attorney's fees and costs to prosecute this action, which damages Plaintiff is entitled to recover as a matter of law.

WHEREFORE, Plaintiff requests relief as hereinafter provided.

## EIGHTH CAUSE OF ACTION

## INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

280. As an eighth, separate, and distinct cause of action, Plaintiff complains against Defendants, and realleges all the allegations contained in the Complaint, and incorporates them by reference into this cause of action as though fully set forth herein.

281. As described above, Defendants breached the EA Agreement by terminating Mr. Berkhoff's insurance appointment for pretextual and unlawful reasons.

282. As described above, Defendants wrested control over Plaintiff's client relationships and the continuing commissions derived therefrom.

283. By misappropriating control over Plaintiff's client relationships and the continuing commissions derived therefrom, Defendants diverted and usurped prospective and likely business opportunities from Mr. Berkhoff in favor of Defendants.

284. Additionally, as described above, Mr. Berkhoff had a reasonable expectation of economic advantage by virtue of having established two successful insurance agencies that has been lost as a result of Defendants' improper and malicious interference through their pretextual termination of Mr. Berkhoff's insurance appointment and misappropriation of Plaintiff's client relationships and the continuing commissions derived therefrom.

285. As a direct and proximate result of Defendants' Intentional Interference With Prospective Economic Advantage as hereinabove alleged, Plaintiff has suffered and continues to suffer substantial economic losses in the form of current and future earnings, all of which Plaintiff would have received had Defendants not terminated Mr. Berkhoff's insurance appointment.

286. As a direct and proximate result of Defendants' Intentional Interference With Prospective Economic Advantage as hereinabove alleged, Plaintiff has suffered from the forced removal of approximately 1,900 clients from Vegas Valley Insurance's and Golden Insurance's insurance rolls, all to Plaintiff's economic, emotional, special, and general damage according to proof at the time of trial.

287. As a proximate result of Defendants' Intentional Interference With Prospective Economic Advantage as hereinabove alleged, Plaintiff has been harmed in that Plaintiff has

suffered humiliation, mental anguish, and emotional and physical distress, and has been injured in mind and health.

288. As a result of said distress and consequent harm, Plaintiff has suffered such damages in an amount in accordance with proof at time of trial.

289. Defendants, and each of them, authorized, ratified, knew of the wrongful conduct complained of herein, but failed to take immediate and appropriate corrective action to remedy the situation and thereby acted fraudulently, maliciously, oppressively and with reckless disregard of Plaintiff's rights, and thereby entitling Plaintiff to an award of punitive damages.

290. It has been necessary for Plaintiff to retain legal counsel through the Law Office of S. Don Bennion, and Plaintiff has sustained damages in the form of attorney's fees and costs to prosecute this action, which damages Plaintiff is entitled to recover as a matter of law.

WHEREFORE, Plaintiff requests relief as hereinafter provided.

## NINTH CAUSE OF ACTION

## INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS

291. As a ninth separate, and distinct cause of action, Plaintiff complains against Defendants, and realleges all the allegations contained in the Complaint, and incorporates them by reference into this cause of action as though fully set forth herein.

292. As described above, Defendants breached the EA Agreement by terminating Mr. Berkhoff's insurance appointment for pretextual and unlawful reasons.

293. As described above, Defendants wrested control over Plaintiff's client relationships and the continuing commissions derived therefrom.

294. Prior to these events, Plaintiff had existing contracts with the approximately 1,900 clients from Vegas Valley Insurance's and Golden Insurance's insurance rolls.

295. Prior to these events, Plaintiff had existing contracts with the landlord of his leased office space on 2235 East Flamingo Road in Las Vegas, Nevada.

296. By virtue of its position as an insurance underwriter and provider of insurance products to Plaintiff's clients, Defendants were aware and knew of Plaintiff's existing contracts with the approximately 1,900 clients from Vegas Valley Insurance's and Golden Insurance's insurance rolls.

297. By misappropriating control over Plaintiff's client relationships and the continuing commissions derived therefrom, and by intending to enforce a Non-Competition clause against Mr. Berkhoff which ostensibly prevents him from contacting said insurance clients, Defendants have actually and significantly disrupted Plaintiff's existing contracts with the approximately 1,900 clients from Vegas Valley Insurance's and Golden Insurance's insurance rolls.

298. Plaintiff has sustained actual damages as a result of the actions of Defendants due to their interference with Plaintiff's existing contractual relationships.

299. As a direct and proximate result of Defendants' Interference with Mr. Berkhoff's existing Contractual Relationships with the landlord of his leased office space on 2235 East Flamingo Road in Las Vegas, Nevada, Plaintiff has suffered damages as a result of having to cancel his commercial lease.

300. As a direct and proximate result of Defendants' Interference with Mr. Berkhoff's existing Contractual Relationships as hereinabove alleged, Plaintiff has suffered and continues to suffer substantial economic losses in the form of current and future earnings,

all of which Plaintiff would have received had Defendants not interfered with Mr. Berkhoff's existing contractual relationships.

301. As a direct and proximate result of Defendants' Interference with Mr. Berkhoff's existing Contractual Relationships as hereinabove alleged, Plaintiff has suffered by not being able to communicate or solicit future business from the approximately 1,900 clients from Vegas Valley Insurance's and Golden Insurance's insurance rolls, all to Plaintiff's economic, emotional, special, and general damage according to proof at the time of trial.

302. As a proximate result of Defendants' Intentional Interference With Contractual Relations as hereinabove alleged, Plaintiff has been harmed in that Plaintiff has suffered humiliation, mental anguish, and emotional and physical distress, and has been injured in mind and health.

303. As a result of said distress and consequent harm, Plaintiff has suffered such damages in an amount in accordance with proof at time of trial.

304. Defendants, and each of them, authorized, ratified, knew of the wrongful conduct complained of herein, but failed to take immediate and appropriate corrective action to remedy the situation and thereby acted fraudulently, maliciously, oppressively and with reckless disregard of Plaintiff's rights, and thereby entitling Plaintiff to an award of punitive damages.

305. It has been necessary for Plaintiff to retain legal counsel through the Law Office of S. Don Bennion, and Plaintiff has sustained damages in the form of attorney's fees and costs to prosecute this action, which damages Plaintiff is entitled to recover as a matter of law.

WHEREFORE, Plaintiff requests relief as hereinafter provided.

## TENTH CAUSE OF ACTION

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

306. As a tenth separate, and distinct cause of action, Plaintiff complains against Defendants, and realleges all the allegations contained in the Complaint, and incorporates them by reference into this cause of action as though fully set forth herein.

307. The conduct complained of hereinabove was outside the conduct expected to exist in the profession of insurance practice, was intentional and malicious and done for the purpose of causing Plaintiff to suffer humiliation, mental anguish, and emotional and physical distress.

308. Defendants' conduct, in confirming and ratifying the complained of conduct, was done with the knowledge that Plaintiff's emotional and physical distress would thereby increase, and was done with a wanton and reckless disregard of the consequences to Plaintiff.

309. As a proximate result of Defendants' Intentional Infliction of Emotional Distress as hereinabove alleged, Plaintiff has been harmed in that Plaintiff has suffered humiliation, mental anguish, and emotional and physical distress, and has been injured in mind and health.

310. As a result of said distress and consequent harm, Plaintiff has suffered such damages in an amount in accordance with proof at time of trial.

311. Defendants, and each of them, engaging in the conduct as hereinabove alleged, acted fraudulently, maliciously, oppressively and with reckless disregard of Plaintiff's rights and safety, and thereby entitling Plaintiff to an award of punitive damages.

312. Defendants, and each of them, authorized, ratified, knew of the wrongful conduct complained of herein, but failed to take immediate and appropriate corrective action to remedy the situation and thereby acted fraudulently, maliciously, oppressively and with reckless disregard of Plaintiff's rights and safety, and thereby entitling Plaintiff to an award of punitive damages.

313. It has been necessary for Plaintiff to retain legal counsel through the Law Office of S. Don Bennion, and Plaintiff has sustained damages in the form of attorney's fees and costs to prosecute this action, which damages Plaintiff is entitled to recover as a matter of law.

WHEREFORE, Plaintiff requests relief as hereinafter provided.

## ELEVENTH CAUSE OF ACTION

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

314. As an eleventh, separate, and distinct cause of action, Plaintiff complains against Defendants, and realleges all the allegations contained in the complaint, and incorporates them by reference into this cause of action as though fully set forth herein.

315. In the alternative, if said conduct of Defendants, and each of them, and of their agents and employees was not intentional, it was negligent, and Plaintiff is thereby entitled to general damages for the negligent infliction of emotional distress.

316. As a proximate result of Defendants' Negligent Infliction Of Emotional Distress as hereinabove alleged, Plaintiff has been harmed in that Plaintiff has suffered humiliation, mental anguish, and emotional and physical distress, and has been injured in mind and health.

317. As a result of said distress and consequent harm, Plaintiff has suffered such damages in an amount in accordance with proof at time of trial.

318. Defendants, and each of them, engaging in the conduct as hereinabove alleged, acted fraudulently, maliciously, oppressively and with reckless disregard of Plaintiff's rights and safety, and thereby entitling Plaintiff to an award of punitive damages.

319. Defendants, and each of them, authorized, ratified, knew of the wrongful conduct complained of herein, but failed to take immediate and appropriate corrective action to remedy the situation and thereby acted fraudulently, maliciously, oppressively and with reckless disregard of Plaintiff's rights and safety, and thereby entitling Plaintiff to an award of punitive damages.

320. It has been necessary for Plaintiff to retain legal counsel through the Law Office of S. Don Bennion, and Plaintiff has sustained damages in the form of attorney's fees and costs to prosecute this action, which damages Plaintiff is entitled to recover as a matter of law.

WHEREFORE, Plaintiff requests relief as hereinafter provided.

## TWELFTH CAUSE OF ACTION

## FRAUDULENT MISREPRESENTATION

321. As a twelfth, separate, and distinct cause of action, Plaintiff complains against Defendants, and realleges all the allegations contained in the Complaint, and incorporates them by reference into this cause of action as though fully set forth herein.

322. Defendants misrepresented to Plaintiff that he could continue - without fear of termination of his insurance appointment - to allocate business between Vegas Valley

Insurance and Golden Insurance in the manner to which he had become accustomed from February 2012 through April 21, 2015.

323. Said misrepresentations include, but are not limited to, Defendants' informing Mr. Berkhoff on multiple occasions that he passed the audits performed by HMEC with respect to Mr. Berkhoff's primary and satellite agencies.

324. Defendants' representations were intentionally made, and with the intent that Plaintiff rely on such misrepresentations.

325. Plaintiff relied on said intentional misrepresentations by continuing to allocate business between Vegas Valley Insurance and Golden Insurance in the manner to which he had become accustomed between February 2012 and April 21, 2015.

326. Despite representing to Plaintiff that he would not have his insurance appointment terminated, Defendants' terminated Mr. Berkhoff's insurance appointment on the pretext that he misallocated business between Vegas Valley Insurance and Golden Insurance.

327. As a direct and proximate result of Defendants' Fraudulent Misrepresentation as hereinabove alleged, Mr. Berkhoff's insurance appointment was terminated on or about April 21, 2015.

328. As a direct and proximate result of Defendants' Fraudulent Misrepresentation as hereinabove alleged, Plaintiff has suffered and continues to suffer substantial economic losses in the form of current and future earnings.

329. As a direct and proximate result of Defendants' Fraudulent Misrepresentation as hereinabove alleged, Plaintiff has suffered from the forced removal of approximately 1,900 clients from Vegas Valley Insurance's and Golden Insurance's insurance rolls, all to

Plaintiff's economic, emotional, special, and general damage according to proof at the time of trial

330. As a proximate result of Defendants' Fraudulent Misrepresentation as hereinabove alleged, Plaintiff has been harmed in that Plaintiff has suffered humiliation, mental anguish, and emotional and physical distress, and has been injured in mind and health.

331. As a result of said distress and consequent harm, Plaintiff has suffered such damages in an amount in accordance with proof at time of trial.

332. Defendants, and each of them, engaging in the conduct as hereinabove alleged, acted fraudulently, maliciously, oppressively and with reckless disregard of Plaintiff's rights and safety, and thereby entitling Plaintiff to an award of punitive damages.

333. Defendants, and each of them, authorized, ratified, knew of the wrongful conduct complained of herein, but failed to take immediate and appropriate corrective action to remedy the situation and thereby acted fraudulently, maliciously, oppressively and with reckless disregard of Plaintiff's rights and safety, and thereby entitling Plaintiff to an award of punitive damages.

334. It has been necessary for Plaintiff to retain legal counsel through the Law Office of S. Don Bennion, and Plaintiff has sustained damages in the form of attorney's fees and costs to prosecute this action, which damages Plaintiff is entitled to recover as a matter of law.

WHEREFORE, Plaintiff requests relief as hereinafter provided.

////

////

////

## THIRTEENTH CAUSE OF ACTION

## CONVERSION

335. As a thirteenth, separate, and distinct cause of action, Plaintiff complains against Defendants, and realleges all the allegations contained in the Complaint, and incorporates them by reference into this cause of action as though fully set forth herein.

336. Defendants wrongfully obtained, gained, utilized, and committed a distinct act of dominion over the approximately 1,900 clients from Vegas Valley Insurance's and Golden Insurance's insurance rolls, as well as over the continuing commissions derived therefrom, in a manner which was not authorized by Mr. Berkhoff and which was inconsistent with his rights therein.

337. Defendants' act of dominion over the continuing commissions derived from the approximately 1,900 clients from Vegas Valley Insurance's and Golden Insurance's insurance rolls was in derogation, exclusion, and defiance of Mr. Berkhoff's rights in said property.

338. Following the termination of his insurance appointment on April 21, 2015, Defendants owed Mr. Berkhoff monies pursuant to a TPP clause in the EA Agreement.

339. Mr. Berkhoff received two direct deposit payments of TPP monies in July and August of 2015, each of which reflect a failure by Defendants to pay the proper TPP amounts that they are contractually obligated to pay to Mr. Berkhoff.

340. Defendants' continuing and wrongful act of dominion over the remaining and unpaid TPP monies owed to Mr. Berkhoff is in derogation, exclusion, and defiance of Mr. Berkhoff's rights in said property.

341. As a direct and proximate result of Defendants' conversion, Plaintiff has suffered from the forced removal of approximately 1,900 clients from Vegas Valley Insurance's and Golden Insurance's insurance rolls, all to Plaintiff's economic, emotional, special, and general damage according to proof at the time of trial.

342. As a direct and proximate result of Defendants' conversion, Plaintiff continues to suffer from Defendants' wrongful act of dominion over the remaining unpaid TPP monies which are owed to Mr. Berkhoff.

343. As a proximate result of Defendants' conversion, Plaintiff was caused to suffer, and continues to suffer, from embarrassment, humiliation, severe emotional distress, shunning, anxiety, anguish, fear, loss of capacity to garner future insurance appointments with other companies, employability, and significant economic loss in the form of current and future earnings, as well as the forced removal of approximately 1,900 clients from Vegas Valley Insurance's and Golden Insurance's insurance rolls, all to Plaintiff's economic, emotional, special, and general damage according to proof at the time of trial.

344. Defendants did the things hereinabove alleged, intentionally, oppressively, and maliciously with an evil and malevolent motive to injure Plaintiff.

345. All actions of Defendants, their employees and agents, and each of them as herein alleged, were known, ratified and approved by the officers or managing agents of Defendants, and each of them. Therefore, Plaintiff is entitled to punitive or exemplary damages against Defendants, in an amount to be determined at the time of trial.

346. It has been necessary for Plaintiff to retain legal counsel through the Law Office of S. Don Bennion, and Plaintiff has sustained damages in the form of attorney's fees

and costs to prosecute this action, which damages Plaintiff is entitled to recover as a matter of law.

WHEREFORE, Plaintiff requests relief as hereinafter provided.

## FOURTEENTH CAUSE OF ACTION

## CIVIL CONSPIRACY

347. As a fourteenth separate, and distinct cause of action, Plaintiff complains against Defendants, and realleges all the allegations contained in the Complaint, and incorporates them by reference into this cause of action as though fully set forth herein.

348. The Defendants, by acting in concert, intended to accomplish the unlawful objective of misappropriating control over Plaintiff's client relationships and the continuing commissions derived therefrom.

349. The Defendants, by acting in concert, and by utilizing an overbroad Non-Competition provision, intend to accomplish the unlawful objective of diverting and usurping prospective and likely business opportunities from Mr. Berkhoff in favor of Defendants.

350. Defendants accomplished their Civil Conspiracy by terminating Mr. Berkhoff's insurance appointment on a pretextual basis, without cause, and in violation of the EA Agreement.

351. As a direct and proximate result of Defendants' Civil Conspiracy, Plaintiff has suffered and continues to suffer substantial economic losses in the form of current and future earnings, all of which Plaintiff would have received had Defendants not engaged in Civil Conspiracy.

352. As a direct and proximate result of Defendants' Civil Conspiracy, Plaintiff has suffered from the forced removal of approximately 1,900 clients from Vegas Valley

Insurance's and Golden Insurance's insurance rolls, all to Plaintiff's economic, emotional, special, and general damage according to proof at the time of trial.

353. As a proximate result of Defendants' Civil Conspiracy as hereinabove alleged, Plaintiff has been harmed in that Plaintiff has suffered humiliation, mental anguish, and emotional and physical distress, and has been injured in mind and health.

354. As a result of said distress and consequent harm, Plaintiff has suffered such damages in an amount in accordance with proof at time of trial.

355. Defendants, and each of them, authorized, ratified, knew of the wrongful conduct complained of herein, but failed to take immediate and appropriate corrective action to remedy the situation and thereby acted fraudulently, maliciously, oppressively and with reckless disregard of Plaintiff's rights, and thereby entitling Plaintiff to an award of punitive damages.

356. It has been necessary for Plaintiff to retain legal counsel through the Law Office of S. Don Bennion, and Plaintiff has sustained damages in the form of attorney's fees and costs to prosecute this action, which damages Plaintiff is entitled to recover as a matter of law.

WHEREFORE, Plaintiff requests relief as hereinafter provided.

**FIFTEENTH CAUSE OF ACTION**

**DECLARATORY RELIEF (NEVADA)**

357. As a fifteenth separate, and distinct cause of action, Plaintiff complains against Defendants, and realleges all the allegations contained in the Complaint, and incorporates them by reference into this cause of action as though fully set forth herein.

358. Nevada Revised Statue 30.100 specifically provides for further relief based on a declaratory judgment as is now necessary in this action.

359. Plaintiff alleges a justiciable controversy exists between the parties to this action that is now ripe for this Court to determine the respective interests of the parties as set forth herein.

360. Plaintiff requests this Honorable Court to declare that the Non-Competition provisions in the Vegas Valley EA Agreement and the Golden EA Agreement are overbroad and unenforceable under Nevada law.

361. Plaintiff requests this Honorable Court to render a Declaratory Judgment declaring Mr. Berkhoff's rights under the EA Agreement, including his rights to receive continuing and proper TPP payments pursuant to the EA Agreement.

362. It has been necessary for Plaintiff to retain legal counsel through the Law Office of S. Don Bennion, and Plaintiff has sustained damages in the form of attorney's fees and costs to prosecute this action, which damages Plaintiff is entitled to recover as a matter of law.

**WHEREFORE**, Plaintiff prays for the following relief:

1. For an award of general, actual, and compensatory damages;
2. For an award of punitive damages against any and/or all Defendant(s);
3. That this Court issue a Preliminary Injunction against Defendants enjoining them from enforcing the Vegas Valley EA Agreement's and the Golden EA Agreement's Non-Competition provisions;
4. That this Court issue a Permanent Injunction against Defendants enjoining

them from enforcing the Vegas Valley EA Agreement's and the Golden EA Agreement's Non-Competition provisions;

5. That this Court:

(a) Issue a judgment declaring that the Non-Competition provisions in the Vegas Valley EA Agreement and the Golden EA Agreement are overbroad and unenforceable;

(b) Render a Declaratory Judgment declaring Mr. Berkhoff's rights under the EA Agreement;

(c) Adjudge, decree, and declare the legal relations of Mr. Berkhoff with the subject matter here in controversy, in order that such declaration shall have the force and effect of final judgment.

6. That this Court retain jurisdiction of this matter for the purpose of enforcing this Court's order;

7. For an award of attorney's fees and reasonable costs;

8. That this Court grant such other and further relief as this Court deems equitable and just under the circumstances.

Dated this 12th day of August, 2015.

**LAW OFFICE OF S. DON BENNION**

S. Don Bennion, Esq.
Nevada Bar No. 4530
Bradley J. Cline, Esq.
Nevada Bar No. 13673
10801 W. Charleston Blvd., Suite 170
Las Vegas, Nevada 89135
*Attorneys for John M. Berkhoff*

# VERIFICATION

STATE OF NEVADA )
) ss.
COUNTY OF CLARK )

I, John M. Berkhoff, Plaintiff in the above entitled and numbered cause, affirm under penalty of perjury, that I have read the foregoing Complaint and know the contents thereof, and that the matters and things therein stated are true to my own knowledge, except to those matters therein stated upon my information and belief, and as to those matters I believe them to be true.

Dated this 12 day of August, 2015.

John M. Berkhoff

# EXHIBIT A

EXHIBIT A

# Horace Mann Investors, Inc.
# Exclusive Agent
# Registered Representative Agreement



Horace Mann
Founded by Educators for Educators

## Table of Contents

1. **Business Relationship and Authority**
2. **Horace Mann Investors, Inc. Responsibilities**
3. **Your Responsibilities**
4. **Your Relationships with Your Employees**
5. **Confidentiality**
6. **Expenses**
7. **Indemnification**
8. **Insurance**
9. **Documents**
10. **Payments Collected By You**
11. **Remuneration**
12. **Economic Interest in Policies**
13. **Business Name**
14. **Transfer of Interest**
15. **Termination of Agreement**
16. **Obligations Upon Termination of Agreement**
17. **Certain Remedies Upon Breach Of Obligations**
18. **Notice**
19. **Governing Law - Venue For Claims**
20. **General Provisions**

# EXCLUSIVE AGENT REGISTERED REPRESENTATIVE AGREEMENT

This Agreement is between Horace Mann Investors, Inc. hereinafter referred to as the "Company" or "HMII" and ____________, hereinafter referred to as "You" or "Your".

The Company and You agree as follows:

1. **Business Relationship and Authority**

   A. The Company appoints You as a registered representative of the Company to solicit applications for transactions in those jurisdictions in which You have been properly licensed and registered to solicit such applications. As such, You are **not** an employee of the Company.

   B. As a registered representative, You will have the opportunity to sell and service only those securities and other products which have been approved in writing by the Company, which products may be changed at the discretion of the Company. These products may include products issued by affiliates of the Company and by unaffiliated companies with whom the Company or an affiliate has entered into agreements ("Partnering Companies"). The Company and its affiliates are sometimes referred to in this Agreement as "Horace Mann".

   C. You are authorized on behalf of the Company, during the term of this Agreement, to receive and accept, subject to such restrictions on binding authority as may be established by the Company, applications for insurance and other financial products as the Company may from time to time authorize. All of the insurance, financial and related products and services solicited, negotiated, produced, accepted, renewed or serviced by You or employees working for You during this Agreement shall be solicited, negotiated, produced, accepted, renewed or serviced exclusively for, on behalf of and in the name of the Company, Horace Mann, and/or the Partnering Companies, as applicable. You are prohibited from soliciting, brokering or placing such business with companies other than the Company, Horace Mann, or the Partnering Companies The Company, Horace Mann and the Partnering Companies own all business produced under this Agreement.

   D. You will not represent Yourself as having any authority other than that specifically granted to You by the Company. You will not alter any contract or incur any expense or obligation for the Company without prior written approval from the Company.

   E. The Horace Mann Investors, Inc. Registered Representative Compliance Manual ("RRCM") and Horace Mann Exclusive Agent Commission Schedule attached hereto as Exhibit B ("Commission Schedule"), as they may be amended from time to time, are expressly incorporated in their entirety as part of this Agreement. References to this Agreement shall include the RRCM and Commission Schedule unless otherwise specified. The Company reserves the right in its sole discretion to amend the RRCM and Commission Schedule at any time. The Company will provide You with the Amendments as soon as practical, except the notice regarding changes to commission amounts will be given as indicated in Section 11

F. You acknowledge You are an independent contractor and nothing contained in this Agreement shall be construed to create the relationship of employer and employee between the Company and You. You will have control and are free to exercise independent judgment as to the time, place, manner and methods of soliciting insurance policies and other Company business, servicing clients, and otherwise carrying out the provisions of this Agreement, consistent with the terms of this Agreement.

G. You acknowledge that the Company reserves the right to establish minimum production requirements at a future date. You will be notified 60 days prior to the date upon which measurement of production will commence.

H. You acknowledge that the Company reserves the right to obtain a credit report for You, and by signing this Agreement You consent to such action as deemed necessary by the Company..

2. **Company Responsibilities**

The Company will determine, in its sole discretion, all matters relating to the business and the operation of the Company, including, but not limited to, the following:

A. Determination of products offered and crediting rates;

B. Suitability standards, including acceptance or rejection of any application;

C. Termination or modification of any contract to which the Company is a party or the refusal to renew any contract, subject to the terms of the respective contracts;

D. Limitation, restriction, or discontinuance of the selling of any products;

E. Choosing, contracting with or terminating relationships with Partnering Companies and affiliates;

F. Obtaining of any licenses for the Company or the Company's withdrawal from any state, jurisdiction, or territory; and

G. The appointment, registration, and termination of all registered representatives of the Company, including licensed support staff.

3. **Your Responsibilities**

A. You are a registered representative of the Company for the purpose of soliciting, selling, and servicing the authorized products in accordance with the provisions of this Agreement and any procedures provided by the Company. A key reason for Your engagement by the Company is Your experience and ability to provide quality sales and service.

B. You may not charge a fee in addition to the Horace Mann and/or Partnering Companies charged policy premium and fees for writing or servicing the business under this Agreement.

C. From time to time, You will be asked and You will provide certain dates, information and/or analysis relating to the Company's business. This shall not give the Company control over Your time or direction or control over the manner or means by which You shall conduct Your business, but only serves to assist the Company in its analysis of its operations.

D. You agree to maintain any required FINRA license and any required insurance agent or producer license in the state or states in which You are appointed to represent the Company under this Agreement and to comply with any and all applicable federal, state, or local laws, rules, regulations and ordinances affecting Your operation. The licensing and registration of registered representatives with FINRA and any applicable states will be subject to the approval of the Company. You further agree that You will not solicit or offer products authorized by the Company hereunder prior to being properly licensed and appointed with FINRA and all applicable states.

E. You agree the Company will have the authority to use Your name and signature, or facsimile thereof, on policy documents and customer communication materials.

F. You agree to maintain a professional business relationship with the Company, and, when requested, to meet with Company representatives at mutually convenient times to discuss various business topics. You also agree that, because You are conducting business with the public under the Company's name, Company representatives shall be permitted access to Your office to review compliance with this Agreement during office business hours. Further, You agree to work within the bounds of the Horace Mann brand and computer security guidelines.

G. You agree, as requested by the Company, You will demonstrate Your knowledge of the Company approved products You are authorized to sell, as well as knowledge of federal, state, or local laws, rules, regulations and ordinances affecting Your operation. If You are unable to adequately demonstrate Your knowledge of any product, the Company reserves the right to deny You the authority, or withdraw Your existing authority, to sell that product until You demonstrate such knowledge. You understand that your failure to understand and abide by all applicable laws and regulations can result in disciplinary action by the Company, FINRA and other regulatory authorities up to and including, but not limited to, termination of this Agreement and/or termination of registration with FINRA as outlined in the RRCM.You agree to seek prior written approval from the Company before engaging in any private securities transaction as defined by NASD rule 3040. The Company may, at its discretion, prohibit these activities and You agree to be bound by the Company's determination in these matters.

H. You agree to seek written approval from the Company prior to being employed by, accepting compensation from, or engaging in any outside business activities that are outside the scope of your relationship with the Company in accordance with this Agreement. During the term of this Agreement You agree that You will not seek or maintain registration with any other broker-dealer, with the sole exception that you may become registered with a broker/dealer affiliate of the Company upon written approval of the Company.

I. You agree to abide by the compliance training and continuing education requirements established by the Company and FINRA, including but not limited to attendance at compliance and training meetings and completion of electronic courses.

J. You agree to forward all customer inquiries and correspondence relating to securities and other authorized product complaints pursuant to the procedures in the RRCM. Under no circumstances are You to directly respond to, or attempt to resolve, a customer complaint or dispute, or accept responsibility or assume liability to any client. In the event that You act in violation of this section of this Agreement and accept liability, You agree that You have no binding authority on behalf of the Company, its affiliates, or Partner Companies, and You are wholly responsible for all resulting costs and fees.

K. You agree, in addition to any other rules, regulations, policies, and procedures outlined in this Agreement, to abide by all of the Company's rules, regulations, policies, and procedures related to the sales of securities and other authorized products set forth in the RRCM, as well as any other bulletins, correspondence, and communications from the Company. By signing this Agreement you acknowledge that you have read the and agree to abide by the RRCM.

L. You agree that You will immediately notify the Company of any address changes for Your home or office, any judgment, lien, civil suit, action or legal proceeding to which You have been named a party, any criminal proceeding in which You have been convicted, indicted, or plead guilty or no contest, any arrests excluding minor traffic violations, or charges against or indictments against You. Further, You consent to immediately notify the Company of any disciplinary action, revocation of license or registration, or suspension by a regulatory authority or any securities or other authorized product complaint brought against You. You agree to abide by Company procedures established to comply with FINRA rules regarding the Company's responsibility to supervise Your activities related to the sale of securities and other authorized products and to not hinder the Company's ability to carry out those responsibilities through any act or omission on Your part.

M. You will comply with all suitability and compliance standards established by the Company as outlined in the RRCM, any other procedures established by the Company and communicated to You, and applicable rules and regulations.

N. You agree to establish and abide by an "Out of office" policy in accordance with the following standards:

> If You are going to be out of the office for two or more consecutive business days You should notify Your supervisor and the Company's compliance area in advance; notification by e-mail is sufficient. Set an out of office message in Your e-mail and voicemail indicating when You will return and contact information for clients directing them to Your supervisor or the home office for questions. Leave a number with Your supervisor where You can be reached in an emergency. Supervisors and the home office will make every effort to avoid calling You unless absolutely necessary. You must provide a reasonable means for Your

supervisor or home office personnel to access client files if needed. Your office assistant(s) must be reminded that they cannot discuss securities products accounts with clients and should forward these calls to Your supervisor or the home office. The office assistant(s) should be provided a number where You can be reached in an emergency.

O. You will use HMII approved signs and advertising copy, including, but not limited to, sales brochures, display advertisements in telephone directories, newspaper advertisements, radio and television commercials, electronic media displays, all sales promotional plans and devices, and all customer contract forms, and other forms and materials if they use or contain any reference to any service mark or trade name of HMII or any product offered through HMII including but not limited to variable universal life insurance, variable annuities, indexed annuities, and mutual funds. You will not use any such advertising material or sales promotional plan or device without obtaining prior written approval from the Company. The Company has the right to disapprove any or all of the aforesaid advertising forms and other materials insofar as they, in the exclusive judgment of the Company, do not conform to the requirements of any federal, state, or local governmental rules, regulations, or laws.

4. **Your Relationships with Your Employees**

A. You have no authority to employ persons on behalf of the Company, and no employee of Yours will be deemed to be an employee of the Company, such employees at all times remaining Your employees. You have sole and exclusive control over Your labor and employee relations policies, and Your policies relating to wages, hours, and working conditions of Your employees with the exception of certain conditions outlined in this section 4. You have the right to hire, transfer, suspend, lay-off, recall, promote, assign, discipline, and discharge Your employees.

B. Your employees will be compensated directly by the Company or an affiliate or by the Company or an affiliate through You. No compensation for the sale of securities may be paid through Your agency to Your employees. A written agreement must be kept on file in Your office as well as the Company's home office outlining the terms of the compensation arrangement between You and Your employees who are registered to sell securities products through the Company. You are responsible for maintaining records for all securities related compensation arrangements between You and Your employees. Additionally you agree to provide those records to the Company on a schedule to be determined, and provided to you, by the Company, as may be amended from time to time by the Company.

C. You agree that Your appropriately registered employees, while working in connection with this Agreement, will not be entitled to solicit, sell or service, any products You would not be allowed to solicit, sell or service under this Agreement and You are responsible to insure they comply with any and all applicable federal, state, or local laws, rules, regulations, and ordinances relating to the conduct of business under this

Agreement. Further, You agree that unlicensed and unregistered individuals are not allowed to solicit or service products in a manner that would require registration with FINRA and/or appointment with the Company.

While You will maintain an employer/employee relationship with Your securities licensed staff, You understand and consent that all securities licensed employees will be supervised by a principal designated by the Company with regard to their sales, solicitation, and servicing activities relating to products offered through the Company. Further, You understand that HMII has authority to enforce sanctions on Your securities licensed producers in accordance with the RRCM, Written Supervisory Procedures, and other procedures enacted by the Company.

5. **Confidentiality**

A. HMII and Partnering Companies will furnish You with certain confidential proprietary information concerning Horace Mann and/or Partnering Companies business plans and procedures, as well as other confidential information relating to past, current or prospective policyholders and customers. Horace Mann and/or Partnering Companies may also furnish You with certain software, hardware, equipment or supplies in order to promote quality control and facilitate Horace Mann and/or Partnering Companies business processes. Such property and information furnished by Horace Mann and/or Partnering Companies will remain the property of Horace Mann and/or Partnering Companies, respectively.

B. You agree You will not at any time or in any manner, directly or indirectly, disclose to any third party or permit any third party to access any confidential information or any information containing trade secrets concerning any matters affecting or relating to the pursuits of HMII and/or Partnering Companies, except upon direct written authority of HMII and/or Partnering Companies, respectively or pursuant to a valid court order. Furthermore, upon termination of this Agreement, You agree to treat as confidential and not to disclose, either directly or indirectly, to any third party any confidential information or trade secrets of HMII and/or Partnering Companies except upon direct written authority of HMII and/or Partnering Companies, respectively or pursuant to a valid court order. Further, You agree that You will provide appropriate safeguards (for example, locked file cabinets, privacy screens for computer monitors, etc.) to prevent inadvertent observation of confidential information by clients and others entering Your office.

C. You agree You will not disclose or grant access to any confidential information or trade secrets of HMII and/or Partnering Companies to any of Your employees or other persons providing services for You in connection with this Agreement, unless such employee or other person has a need to know such information and has signed a copy of the Confidentiality and Non-Solicitation Agreement, as prescribed by the Company, and You have forwarded a copy of the signed agreement to the Company.

D. Confidential information as discussed herein includes, but is not limited to: software, business plans or models of HMII and/or Partnering Companies; information regarding the names, addresses, social security numbers, credit card, bank card or other financial institution information, birthdates, and ages of past, current or prospective policyholders

and customers of HMII and/or Partnering Companies; types of policies; amounts of insurance; premium amounts; the description and location of insured property; the expiration or renewal dates of policies; policyholder listings and any policyholder information subject to any privacy law; claim information; certain information and material identified by HMII and/or Partnering Companies as confidential or information considered a trade secret as provided herein or by law; and any information concerning any matters affecting or relating to the pursuits of HMII and/or Partnering Companies that is not otherwise lawfully publicly available. Such confidential information may be used by You and Your staff only for the purposes of carrying out the provisions of this Agreement.

6. **Expenses**

You will be responsible for the payment of all expenses You incur in the performance of this Agreement including, but not limited to: expenses for Your sales location, supplies and equipment, registrations, testing and licensing fees, compensation, except as provided in Section 4 of this agreement, of Your employees or other assisting persons whom You engage, telephone, broadband connections, postage, mileage, insurance and advertising expenses incurred at Your direction (including submitting materials to FINRA for review), and all other charges and expenses that You incur. This includes any benefits costs and/or taxes for Yourself, Your employees or other assisting persons whom You engage.

7. **Indemnification**

A. The Company will defend and indemnify You against liability, including the cost of defense and settlements, imposed on You by law for damages sustained by any person and caused by acts or omissions of the Company, except and to the extent that You have caused or contributed to cause such liability by Your acts or omissions. Intentional or deliberate wrongful acts on Your part are wholly excluded from indemnity. This Agreement shall not be construed to convey indemnity for software, business disruption or interruption, premises liability at Your facility and/or automobile related damages. You agree, as a condition to such indemnification, to notify the Company promptly of any claim or suit against You and to allow the Company to make such investigation, settlement, or defense as the Company deems prudent. The Company reserves the right to select counsel to represent You in connection with any such claim or suit. You also agree to cooperate fully with the Company in any such investigation, settlement, or defense.

B. You will indemnify the Company against liability, including the cost of defense and settlements, imposed on the Company by law for damages sustained by any person and caused by Your acts or omission, or those of any employee or other person working for or with You in connection with this Agreement, except and to the extent that the Company has caused or contributed to cause such liability by its acts or omissions. The Company agrees, as a condition to such indemnification, to notify You promptly of any such claim or suit. The Company reserves the right to select counsel to represent it in connection with any such claim or suit and to make such investigation or settlement as the Company deems prudent.

8. **Insurance**

A. You agree You will, at Your sole expense, obtain and maintain during the term of this Agreement policies of insurance as may be required from time to time by Horace Mann. You shall be responsible for acquiring and maintaining adequate Errors and Omissions coverage for You and Your staff. Such policies must be obtained from companies satisfactory to the Company and must be adequate to protect against all expenses, claims, actions, liabilities, and losses related to the subjects covered by the required policies. Such coverages shall be primary to any applicable insurance or indemnity of Company.

B. You must furnish the Company with proof of insurance upon request by the Company. If, in the Company's opinion, such policies do not afford adequate protection for the Company, the Company will so advise You. Failure to furnish evidence of acceptable coverage within fifteen (15) days after being requested to do so by the Company, shall constitute breach of this Agreement.

9. **Documents**

A. You shall maintain all financial books and records relating to the business under this Agreement, including but not limited to, all checkbooks, check registers, deposit receipts, and general ledgers for a period of not less than ten years after the close of the fiscal year to which they relate, or longer as required by law.

B. You shall also maintain all supporting documents required by applicable rules and regulations, including but not limited to, signed applications, customer records, correspondence, supplemental forms, and/or other materials that relate to conducting business under this Agreement (including but not limited to materials relating to Outside Business Activities overseen by the Company). The applicable underwriting standards are subject to change by Horace Mann and/or Partnering Companies as such are communicated to You from time to time.

C. All of the foregoing records identified in this Section 9 shall be open and available for inspection or audit at any time during normal agency hours with or without notice by the Company or its designated auditors and You shall have the duty to cooperate fully with the party(ies) making such inspection or audit.

D. All such documents identified in paragraph B of this Section 9 are and shall remain the property of the Company. These documents shall be maintained in accordance with the RRCM and shall be provided to the Company upon termination of this Agreement.

10. **Payments Collected By You**

If You receive any payments from customers or prospective customers in the performance of this Agreement, those payments must be made payable to the applicable issuer of the product applied for,, and You will promptly transmit and report such payments as directed by the Company without deduction for any purpose. You shall not accept payments in the form of cash or money orders for any securities transaction. Under no circumstances will You be permitted to retain customer funds. You must enter the receipt and transmittal of said funds on Your office blotter. You will submit all application materials and customer funds in accordance with procedures outlined in the RRCM. The Company reserves the right to

refuse, or request additional information and documentation prior to making a determination of acceptance or suitability of a customer application or purchase request.

11. **Remuneration**

A. The sole remuneration to which You will be entitled for services rendered pursuant to this Agreement will be the commissions set forth in the Commission Schedule, as may be amended by the Company in its sole discretion from time to time. The Company or an affiliate will pay You Your commissions at the time and in the manner set forth in the Commission Schedule. However, due to changing business conditions, the Company reserves the right to increase or decrease any commission amounts and to change the commission rules. If the Company changes commission amounts, it will provide You with written notice of the changes at least thirty (30) days prior to the date on which they are to become effective.

B. From time to time, the Company, in its sole discretion, may provide You with additional incentives based on performance in accordance with all applicable laws and regulations.

C. If any application for insurance or securities or purchase request is rejected or reversed, or any policy is surrendered or canceled, in whole or in part, for any reason, before the expiration of the policy period, or if any premium or contributions are reduced or any overpayment is made to You, or if any premium paid is not earned, or if You have requested the Company perform services for You and the payment for those services is more than 60 days past due, then the commissions paid to You on the amount returned or credited to the policyholder or client, or the amount overpaid to You, or such past due sums will constitute an indebtedness of Yours to the Company and will be charged to You or recovered from You by reducing any future commissions, or incentives due You.

12. **Economic Interest in Policies**

While this Agreement is in effect, the Company will leave in Your book of business all policies and accounts credited to Your book of business so long as the policyholder or account holder resides within a state in which You are registered, licensed and appointed by Horace Mann, except the Company may remove any policy or account from Your book of business at the request of a policyholder or account holder.

13. **Business name**

If You choose to use a separate marketing name (SMO) or marketing name to offer securities products, the SMO or marketing name must be submitted and approved by the Company prior to use. HMII will evaluate the name for compliance with all applicable rules, regulations and laws. However, you will be solely responsible for such compliance. In addition, the name must be appropriate for the insurance business and Horace Mann's corporate image. You must seek prior approval from the Company of Your proposed SMO or marketing name. If the Company, in its sole discretion, deems the SMO or marketing name to be inappropriate, then You will have to adopt an acceptable d/b/a for use with Horace Mann's name. The name must be approved by, and/or registered with, the appropriate state agency(ies), where required by law. Also, You are responsible for complying with any

applicable d/b/a requirements and ensuring compliance with all other state and/or federal registration and licensing requirements.

14. **Transfer of Interest**

A. This Agreement is personal to You and is being entered into in reliance upon and in consideration of Your skill, qualifications, and representations. Accordingly, You may not execute a transfer of Your interest in this Agreement or any interest in the business under this Agreement, including but not limited to, any sale, assignment, conveyance or the granting of any lien, security interest, pledge, or mortgage thereof, without the prior written approval of the Company. A transfer of Your economic interest in this Agreement includes, but is not limited to, any sale, merger, or assignment of this Agreement or any rights or obligations under it.

B. You have an economic interest, as defined in this Agreement, in Your Horace Mann customer accounts developed under this Agreement. Subject to the terms and conditions set forth in this Agreement and in accordance with the procedures set forth in the EA Standards and Guidelines, You may transfer Your economic interest in the business written under this Agreement upon termination of this Agreement by selling the economic interest in the business to an approved buyer. The Company retains the right in its sole discretion to approve or disapprove such a transfer. Any failure to disclose and obtain the prior written approval of the Company for any transfer of Your interest in this Agreement or any interest in the business under this Agreement shall constitute a breach of this Agreement.

C. Approval of a proposed transfer of Your interest in this Agreement will be conditioned upon the termination of this Agreement and the execution of a then current exclusive agent registered representative agreement by the approved transferee.

D. Policies and accounts in Your book of business and any applicable rights to termination payments will be transferred to the approved transferee.

E. Life insurance and annuity commissions classified as "renewals" are payable only to the original writing agent. As such they are not considered part of Your interest in this Agreement which is subject to transfer. You may, however, be eligible for certain vested commission payments related to such renewal commissions. See the **Vested Life and Annuity Renewal Commission** schedule attached to this Agreement. Life insurance commissions classified as "service fees" as well as annuity assets under management, which form the basis for annuity incentive commissions, are subject to transfer to the approved transferee.

15. **Termination of Agreement**

A. This Agreement will be terminated automatically:

1. Upon Your death or permanent incapacity or if Your corporation or limited liability company is dissolved;

2. Upon Your loss of any required FINRA or resident insurance agent or producer license;

3. Upon Your disqualification from selling securities under any state or federal securities law;

4. Upon the termination of your Exclusive Agent Agreement with Horace Mann; or

5. Upon the Company's surrender of or the election not to renew its license to sell securities in the state in which Your sales location is located or the Company's discontinuation of the sale of securities in the state.

B. This Agreement may be terminated:

1. At any time by mutual agreement of the parties in writing;

2. By either party, with or without cause, or reason, upon providing sixty (60) days prior written notice to the other, or such greater number of days as is required by applicable law. Once written notice of termination has been given by either party, You will, immediately upon request of the Company, cease to act or to represent Yourself in any way as an agent or representative of the Company, but You will receive commissions pursuant to Section 11 from the Company for the period up to and including the specified termination date; or

3. Alternatively, by the Company, with cause, immediately upon providing written notice to You. Cause may include, but is not limited to, breach of this Agreement, fraud, forgery, misrepresentation, conviction of a crime, or any other action or omission which could materially harm the Company's business. The list of examples of cause just stated shall not be construed to exclude any other possible ground as cause for termination.

16. **Obligations Upon Termination of Agreement**

The Company agrees that upon any termination of this Agreement it will provide notice of the termination of this Agreement to Your home address as designated with FINRA, which in accordance with this Agreement will be kept current by You at all times.

Except as otherwise provided in a subsequent agreement between You and the Company, upon termination of this Agreement, You agree:

A. You will not act or represent Yourself in any way as an agent or representative of the Company.

B. You will immediately and completely return all property including but not limited to documents, hardware and software including any originals, copies, duplicates or facsimiles, belonging to the Company, or dispose of such property in such manner as the Company specifies.

C. For a period of twelve (12) months following termination, for any reason, You agree You will not solicit the purchase of products or services in competition with those sold by Horace Mann:

1. With respect to any person, company or organization to whom You or anyone acting on Your behalf sold insurance or other products or services on behalf of Horace Mann or a Partnering Company and who is a customer of Horace Mann or a Partnering Company at the time of Your termination,

2. With respect to any person, company or organization who is a customer of Horace Mann or a Partnering Company at the time of termination of this Agreement and whose identity was discovered by You as a result of Your status as a Horace Mann agent or as a result of Your access to Confidential Information of Horace Mann, or

3. From any office or business site located within ten miles of any locations from which You solicited or sold Horace Mann or Partnering Companies' products or services during the year immediately preceding termination of this Agreement.

In the event that such one-year period exceeds the time permitted by any applicable law, such period will be automatically adjusted to the maximum period permitted by such law. If any other provision of this paragraph C conflicts with any existing law, including but not limited to distance, it will be applied to the extent permitted by such law.

D. You are responsible for the immediate return of all confidential information described in Section 5 of this Agreement and any other property to Horace Mann, in good condition, should this Agreement terminate for any reason. Any items not returned will be considered a liability and their value, if ascertainable, is hereby recoverable from any commissions due You or by direct payment from You to the Company when such commissions are insufficient.

E. You will immediately cease and desist from any and all use of Horace Mann service marks and trade names. You will immediately return to the Company all property in Your possession or under Your control bearing any Horace Mann service mark or trade name, or dispose of it in such manner as the Company specifies.

17. **Certain Remedies Upon Breach Of Obligations**

A. You recognize a breach of any of the provisions under Section 16 above will cause irreparable damage to the Company's business and such damage will be difficult or impossible to measure. You agree that in the event of any such breach, the Company, in addition to such other rights and remedies as it may have, will be immediately entitled to an order granting injunctive relief from any court of competent jurisdiction against any act which would violate any such provision, without the necessity of posting a bond, and You waive any defense to an application for such order, except that the violation did not occur. You agree the Company will be entitled to an award of reasonable attorneys' fees, legal interest as permitted by law and court costs in the event it is successful in an application for injunctive relief or in an action based upon breach of the foregoing provisions.

B. You recognize and acknowledge that each of the provisions of Section 16 above is reasonable and necessary to protect and preserve the legitimate business interests of Horace Mann, its present and potential business activities, and the economic benefits derived there from. You recognize and acknowledge the foregoing provisions will not prevent You from earning a livelihood and are not an undue restraint on You.

C. You further acknowledge and agree that if, at the time of enforcement of Section 16, a court shall hold the duration, scope, area or activity restrictions stated are unreasonable under circumstances and applicable law then existing, You and the Company agree the maximum duration, scope, area or activity restrictions deemed by the court to be reasonable under such circumstances shall be substituted for the stated duration, scope, area or activity restrictions specified in this Agreement.

18. **Notice**

All notices will be deemed to have been given if personally delivered, sent by facsimile transmission, or mailed as follows:

if to the Company:

**Horace Mann Investors, Inc.**
1 Horace Mann Plaza
Springfield, IL 62715
Attention: President of Broker/Dealer
And to:
**Horace Mann Investors, Inc.**
1 Horace Mann Plaza
Springfield, IL 62715
Attention: Chief Compliance Officer

if to You:

Your home address on file with FINRA

or to such other person or address as any party may furnish or designate to the other in writing.

19. **Governing Law - Venue For Claims**

A. This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois.

B. The Company and You mutually agree that actions brought by You against the Company, including officers, directors, employees or representatives acting in the capacity of employees, arising out of or related to this Agreement, your conduct as a representative of the Company or your termination as a representative of the Company, to the extent permissible under the FINRA Code of Arbitration, shall seek resolution through FINRA arbitration. Such actions brought by the Company shall, to the extent permissible under the FINRA Code of Arbitration, seek resolution through FINRA arbitration.

20. **General Provisions**

A. This Agreement is the sole and entire agreement between HMII and You, and it supersedes and replaces any prior employment, agency, or other agreement between the Company and You. This Agreement also supersedes any prior oral statements and representations by the Company to You and any prior written statements and representations by the Company to You in letters, manuals, booklets, memoranda, or any other format.

B. This Agreement may not be modified except by a written agreement between the Company through an authorized representative and You which expressly states it modifies this Agreement. No other written statements, representations, or agreements and no oral statements, representations, or agreements will be effective to modify this Agreement. No representative of the Company will have authority to modify this Agreement except as provided in this Section 20. Nothing in this Section will affect the Company's right to amend the RRCM or other procedures and Commission Schedule as provided in this Agreement.

C. You acknowledge You have reviewed the RRCM and Commission Schedule and You have an ongoing responsibility to review all changes to the RRCM and Commission Schedule issued by the Company and agree to be bound by them.

D. References in this Agreement to the RRCM and Commission Schedule include changes which may be made from time to time and distributed to You by the Company, including such being available on the Horace Mann Intranet site.

E. You acknowledge You have read this Agreement, understand it, and agree to be bound by its terms.

F. The descriptive headings of this Agreement are intended for reference only and will not affect the construction or interpretation of this Agreement.

G. If any provision or part of this Agreement is held invalid for any reason, such invalidity will not affect any other provision or part of this Agreement not held invalid, and such remaining provisions and parts will remain in full force and effect.

H. The failure of either party to insist upon the performance of any of the terms of this Agreement in any one or more instances will not be construed as a waiver or relinquishment of the future performance of any such term. The obligation of the parties with respect to any such future performance will continue in full force and effect.

I. Nothing in this Agreement shall be construed to confer upon any person or entity other than Horace Mann and You any rights under this Agreement.

J. This Agreement, and the obligations or rights hereunder, shall not be assignable by You, except as provided by Section 14. The rights and obligations of the parties to this Agreement shall be binding upon and inure to the benefit of the Company and its successors and assigns or legal representative.

K. This Agreement may be executed in counterparts, each of which will be deemed an original.

L. This Agreement shall be binding upon the Company and any successors, including any corporation or corporations acquiring all or substantially all of the assets of the Company whether by merger, consolidation, sale, or other means.

M. Sections 5, 7, 9B, 9C, 9D, 16, 17, 18, and 19 of this Agreement will survive any termination of this Agreement.

IN WITNESS WHEREOF, this Agreement and the attached Exhibits are effective on ________________ and the Company has caused this Agreement to be executed by its authorized representative and You hereby accept the terms of this Agreement.

**Horace Mann Investors, Inc.**

______________________________
(Appropriate Corporate Representative)

______________________________
(Print Name and Title)

______________________________
(Date)

**YOU**

______________________________
(Signature)

John Burkhoff
(Print Name)

8/25/09
(Date)

# EXHIBIT B

EXHIBIT B

# Exclusive Agent Agreement

## ABM Service Corporation

Horace Mann
*Founded by Educators for Educators*

## Table of Contents


1. Business Relationship and Authority ........ 1
2. Horace Mann Responsibilities ........ 2
3. Your Responsibilities ........ 2
4. Sales Location and Territory ........ 3
5. Company Property, Telephone ........ 3
6. Your Relationship with Your Employees ........ 3
7. Confidentiality ........ 4
8. Expenses ........ 4
9. Indemnification ........ 5
10. Insurance ........ 4
11. Documents ........ 5
12. Payments Collected By You ........ 5
13. Remuneration ........ 6
14. Economic Interest in Policies ........ 6
15. Transfer of Interest ........ 6
16. Termination of Agreement ........ 7
17. Obligations Upon Termination of Agreement ........ 7
18. Certain Remedies Upon Breach Of Obligations ........ 8
19. Notice ........ 8
20. Governing Law - Venue For Claims ........ 8
21. General Provisions ........ 9

# Exclusive Agent Agreement

This Agreement is between ABM Service Corporation referred to as the "Company" and

If individual John Berkhoff,

If entity [Name of Agency] acting through its Key Agent, Golden Insurance and Financial Services LLC

hereinafter referred to as "You" or "Your". The Company is affiliated with various insurance companies and financial services firms, identified in Exhibit A, (collectively referred to as "Horace Mann") which strive to provide lifelong financial well-being for educators through personalized service and a full range of tailored insurance and financial products.

The Company and You agree as follows

## 1. Business Relationship and Authority

A. Horace Mann appoints You as an agent of the Company to represent Horace Mann as an Exclusive Agent ("EA"). As such, You are not an employee of the Company or Horace Mann.

B. As an EA, You will have the opportunity to sell and service Horace Mann products and services (collectively referred to as "Horace Mann Business"). In addition, You may have the opportunity to sell and service products of certain unaffiliated companies with which Horace Mann has entered into agreements for such services (collectively referred to as "authorized third-party vendors").

C. You are authorized on behalf of Horace Mann and/or authorized third-party vendors, during the term of this Agreement, to receive and accept, subject to such restrictions on binding authority as may be established by Horace Mann and/or authorized third-party vendors, applications for insurance and other financial products as Horace Mann and/or authorized third-party vendors may from time to time authorize. All of the insurance, financial and related products and services solicited, negotiated, produced, accepted, renewed or serviced by You or employees working for You during this Agreement shall be solicited, negotiated, produced, accepted, renewed or serviced exclusively for, on behalf of and in the name of Horace Mann and/or its authorized third-party vendors and shall be placed exclusively with Horace Mann and/or its authorized third-party vendors. You are prohibited from brokering or placing such business with companies not affiliated with Horace Mann or its authorized third-party vendors. You may, however, write applications for insurance under an assigned risk, cooperative industry, or government established residual market plan or facility or otherwise in accordance with the Company's rules and procedures contained in the EA Standards and Guidelines ("EA Standards and Guidelines"). The Company,
Horace Mann and its authorized third-party vendors own all business produced under this Agreement.

D. You will not represent Yourself as having any authority other than that specifically granted to You by the Company or authorized third-party vendors. You will not alter any contract or incur any expense or obligation for the Company without prior written approval from the Company.

E. The EA Standards and Guidelines and Horace Mann Exclusive Agent Commission Schedule ("Commission Schedule"), as they may be amended from time to time, are expressly incorporated in their entirety as part of this Agreement. References to this Agreement shall include the EA Standards and Guidelines and the Commission Schedule unless otherwise specified. The Company reserves the right in its sole discretion to amend the EA Standards and Guidelines and the Commission Schedule at any time. The Company will provide You with the Amendments as soon as practical, except the notice regarding changes to commission amounts will be given as indicated in Section 13.

F. You acknowledge You are an independent contractor and nothing contained in this Agreement shall be construed to create the relationship of employer and employee between the Company and You. You will have control and are free to exercise independent judgment as to the time, place, manner and methods of soliciting insurance policies and other Company business, servicing policyholders, and otherwise carrying out the provisions of this Agreement, consistent with the terms of this Agreement.

**2. Horace Mann Responsibilities**

The Company will determine, in its sole discretion, all matters relating to the business and the operation of the Company, including, but not limited to, the following:

A. Determination of contract forms and provisions, products offered, premiums, crediting rates, fees, and charges for insurance and other Horace Mann Business;

B. Underwriting standards including acceptance or rejection of any application;

C. Termination or modification of any contract or the refusal to renew any contract, subject to the terms of the respective contracts;

D. Limitation, restriction, or discontinuance of the writing or selling of any policies, coverages, lines, or kinds of insurance or other Horace Mann Business or authorized third-party vendor arrangements;

E. Choosing, contracting with or terminating relationships with authorized third-party vendors and Affiliates;

F. Obtaining of any licenses of Horace Mann or Horace Mann's withdrawal from any state, jurisdiction, or territory; and

G. The appointment of all agents, including licensed support staff.

H. Protection of proprietary information including customer information, Company technology and confidential Company information.

**3. Your Responsibilities**

A. You are an Exclusive Agent of Horace Mann for the purpose of soliciting, selling, and servicing insurance and other Horace Mann Business in accordance with the provisions of this Agreement and any procedures provided by the Company. A key reason for Your engagement by the Company is Your experience and ability to provide quality sales and service.

B. You may not charge a fee in addition to the Horace Mann and/or authorized third-party vendors charged policy premium and fees for writing or servicing the business.

C. You will be expected to meet certain business objectives established and communicated by the Company in the areas of profitability, new business growth, persistency, retention, customer satisfaction and customer service. You will assist the Company in its efforts to achieve market penetration for all forms of Horace Mann Business, and service the Company's customers in a manner consistent with the Company's goodwill, reputation, and overall business strategy. You agree to market to the policyholders and prospective policyholders of Horace Mann and/or authorized third-party vendors only for the benefit of Horace Mann and/or authorized third-party vendors. Failure to meet expected minimum standards and comply with the EA Standards and Guidelines and business objectives communicated by the Company may jeopardize Your relationship with the Company.

D. From time to time, You will be asked and You will provide certain dates, information and/or analysis relating to Horace Mann Business. This shall not give the Company control over Your time or direction or control over the manner or means by which You shall conduct Your business, but only serves to assist the Company in its analysis of its operations.

E. You agree to maintain any required FINRA license and any required insurance agent or producer license in the state or states in which You are appointed to represent Horace Mann and to comply with any and all applicable federal, state, or local laws, rules, regulations and ordinances affecting Your operation.

F. You agree the Company will have the authority to use Your name and signature, or facsimile thereof, on policy documents and customer communication materials.

G. You agree to maintain a professional business relationship with the Company, and, when requested, to meet with Company representatives at mutually convenient times to discuss various business topics. You also agree that,

because You are conducting business with the public under the Horace Mann name, Company representatives shall be permitted access to Your agency to review compliance with this Agreement during agency business hours. Further, You agree to work within the bounds of the Horace Mann brand and computer security guidelines.

H. You agree, as requested by the Company, You and/or Your licensed staff will demonstrate Your and/or their knowledge of the Horace Mann products You and/or they are authorized to sell, as well as knowledge of federal, state, or local laws, rules, regulations and ordinances affecting Your operation. If You and/or they are unable to adequately demonstrate Your and/or their knowledge of any product, the Company reserves the right to deny You and/or them the authority, or withdraw Your and/or their existing authority, to sell that product until You and/or they demonstrate such knowledge.

I. In the event you are operating as a corporation or limited liability company, You agree you have obtained any applicable licenses or registrations required by law for your corporation or limited liability company prior to the execution of this Agreement and will continue to maintain applicable licenses or registrations required by law throughout this Agreement. You agree that You will notify the Company of any change in the Key Agent's relationship with the corporation or limited liability company or cessation of performance of services for such. In addition, You agree to provide the Company upon request Your corporate documentation including officers of Your corporation and percentage of ownership. You agree that neither You nor any of the shareholders, officers or directors will transfer, sell, or assign any interest in the corporation or limited liability company without prior written consent of the Company. You agree to notify the Company of a proposed sale, transfer or assignment of any interest in any shares of or interest in the corporation or limited liability company. The Company retains the right in its sole discretion to approve or not approve such transfer, sale or assignment.

## 4. Sales Location and Territory

A. You may select Your sales location, within a geographical area specified by the Company, subject to Company approval. Initially, You have selected the sales location noted in Exhibit B and such sales location has been approved by the Company. You agree You will not establish any additional sales location or close/change Your existing sales location without the prior written approval of the Company. Your territory is defined by the Company and consists of certain schools and/or school districts. You understand and agree the Company, it its sole discretion, may reassign the schools and/or school districts in Your territory.

B. You agree to remain actively involved in Your sales location(s) and to keep Your sales location(s) open for business as appropriate to provide a proper level of customer service. You agree to operate Your sales location(s) in a professional manner consistent with the EA Standards and Guidelines.

C. You are authorized to sell insurance and financial products and services offered by the authorized third-party vendors and Horace Mann Business only in the state containing Your sales location and other states in which You are properly licensed, registered and appointed as an agent by Horace Mann and/or the authorized third-party vendors.

## 5. Company Property, Telephone

A. You are responsible for acquiring and maintaining all materials and equipment used in the operation of Your Agency; however, at the discretion of the Company, the Company may provide You with certain items to facilitate business processes including, but not limited to, software, hardware, forms, manuals, records, in order to promote quality control and facilitate Horace Mann and/or authorized third-party vendors business processes and to assist You in fulfilling the terms of this Agreement. All such property and information supplied by the Company will remain the property of the Company.

B. All telephone numbers used in connection with business conducted pursuant to this Agreement are the property of the Company regardless of who pays for the installation and use of the telephone lines.

## 6. Your Relationships with Your Employees

A. You have no authority to employ persons on behalf of the Company, and no employee of Yours will be deemed to be an employee of the Company, such employees at all times remaining Your employees. You have sole and exclusive control over Your labor and employee relations policies, and Your policies relating to wages, hours, and working conditions of Your employees. You have the sole and exclusive right to hire, transfer, suspend, lay-off, recall, promote, assign, discipline, and discharge Your employees.

B. You are responsible for all compensation decisions relating to Your employees.

C. You are responsible for compliance with all other contracts, federal, state or local laws, ordinances, rules, or regulations regarding Your employees, including federal or state laws or regulations regarding minimum compensation, overtime, and equal opportunities for employment. This includes, but is not limited to, compliance with the terms of the federal and state civil rights acts, Age Discrimination in Employment Act, Americans with Disabilities Act, Occupational Safety and Health Act, Immigration Reform and Control Act, and the Fair Labor Standards Act.

D. You agree Your employees, while working in connection with this Agreement, will not be entitled to solicit, sell or service, any products You would not be allowed to solicit, sell or service under this Agreement and You are responsible to insure they comply with any and all applicable federal, state, or local laws, rules, regulations, and ordinances relating to the conduct of business under this Agreement.

**7. Confidentiality**

A. Horace Mann and authorized third-party vendors will furnish You with certain confidential proprietary information concerning Horace Mann and/or authorized third-party vendor's business plans and procedures, as well as other confidential information relating to past, current or prospective policyholders and customers. Horace Mann and/or authorized third-party vendors may also furnish You with certain software, hardware, equipment or supplies in order to promote quality control and facilitate Horace Mann and/or authorized third-party vendor's business processes. Such property and information furnished by Horace Mann and/or authorized third-party vendors will remain the property of Horace Mann and/or authorized third-party vendors, respectively.

B. You agree You will not at any time or in any manner, directly or indirectly, disclose to any third party or permit any third party to access any confidential information or any information containing trade secrets concerning any matters affecting or relating to the pursuits of Horace Mann and/or authorized third-party vendors, except upon direct written authority of Horace Mann and/or authorized third-party vendors, respectively or pursuant to a valid court order. Furthermore, upon termination of this Agreement, You agree to treat as confidential and not to disclose, either directly or indirectly, to any third party any confidential information or trade secrets of Horace Mann and/or authorized third-party vendors except upon direct written authority of Horace Mann and/or authorized third-party vendors, respectively or pursuant to a valid court order. Further, You agree that You will provide appropriate safeguards (for example, locked file cabinets, privacy screens for computer monitors, etc.) to prevent inadvertent observation of confidential information by clients and others entering Your office.

C. You agree You will not disclose or grant access to any confidential information or trade secrets of Horace Mann and/or authorized third-party vendors to any of Your employees or other persons providing services for You in connection with this Agreement, unless such employee or other person has a need to know such information and has signed a copy of the Confidentiality and Non Solicitation Agreement, as prescribed by the Company, and You have forwarded a copy of the signed agreement to the Company.

D. Confidential information as discussed herein includes, but is not limited to: software, business plans or models of Horace Mann and/or authorized third-party vendors; information regarding the names, addresses, social security numbers, credit card, bank card or other financial institution information, birthdates, and ages of past, current or prospective policyholders and customers of Horace Mann and/or authorized third-party vendors; types of policies; amounts of insurance; premium amounts; the description and location of insured property; the expiration or renewal dates of policies; policyholder listings and any policyholder information subject to any privacy law; claim information; certain information and material identified by Horace Mann and/or authorized third-party vendors as confidential or information considered a trade secret as provided herein or by law; and any information concerning any matters affecting or relating to the pursuits of Horace Mann and/or authorized third-party vendors that is not otherwise lawfully publicly available. Such confidential information may be used by You and Your staff only for the purposes of carrying out the provisions of this Agreement.

**8. Expenses**

You will be responsible for the payment of all expenses You incur in the performance of this Agreement including, but not limited to expenses for: Your sales location; supplies and equipment; compensation of Your employees or other assisting persons whom You engage; telephone; broadband connections; postage; mileage; insurance; advertising incurred at Your direction; and, all other charges and expenses that You incur. This includes any benefits costs and/or taxes for Yourself, Your employees or other assisting persons whom You engage.

**9. Indemnification**

A. The Company will defend and indemnify You against liability, including the cost of defense and settlements, imposed on You by law for damages sustained by any person and caused by acts or omissions of the Company, except and to the extent that You have caused or contributed to cause such liability by Your acts or omissions. Intentional or deliberate wrongful acts on Your part are wholly excluded from indemnity. This Agreement shall not be construed to convey indemnity for software, business disruption or interruption, premises liability at Your facility and/or automobile related damages. You agree, as a condition to such indemnification, to notify the Company promptly of any claim or suit against You and to allow the Company to make such investigation, settlement, or defense as the Company deems prudent. The Company reserves the right to select counsel to represent You in connection with any such claim or suit. You also agree to cooperate fully with the Company in any such investigation, settlement, or defense.

B. You will indemnify the Company against liability, including the cost of defense and settlements, imposed on the Company by law for damages sustained by any person and caused by Your acts or omission, or those of any employee or other person working for or with You in connection with this Agreement, except and to the extent that the Company has caused or contributed to cause such liability by its acts or omissions. The Company agrees, as a condition to such indemnification, to notify You promptly of any such claim or suit. The Company reserves the right to select counsel to represent it in connection with any such claim or suit and to make such investigation or settlement as the Company deems prudent.

**10. Insurance**

A. You agree You will, at Your sole expense, obtain and maintain during the term of this Agreement policies of insurance as described in the EA Standards and Guidelines, as may be amended from time to time. You shall be responsible for acquiring and maintaining adequate premises liability coverage for Your office or business location. Such policies must be obtained from companies satisfactory to the Company and must be adequate to protect against all expenses, claims, actions, liabilities, and losses related to the subjects covered by the required policies. Such coverages shall be primary to any applicable insurance or indemnity of Company.

B. Where specified, each policy must name the Company as an additional insured and must contain a severability of interest/cross liability endorsement. Each policy must also expressly provide that it will not be subject to material change, cancellation or termination without at least thirty (30) days prior written notice to the Company.

C. You must furnish the Company with proof of insurance upon request by the Company. If, in the Company's opinion, such policies do not afford adequate protection for the Company, the Company will so advise You. Failure to furnish evidence of acceptable coverage within fifteen (15) days after being requested to do so by the Company, shall constitute breach of this Agreement.

**11. Documents**

A. You shall maintain all financial books and records relating to the business under this Agreement, including but not limited to, all checkbooks, check registers, deposit receipts, and general ledgers for a period of not less than ten years after the close of the fiscal year to which they relate, or longer as required by law.

B. You shall also maintain all supporting documents required by applicable underwriting standards, including but not limited to, signed applications, discount verification and supplemental forms. The applicable underwriting standards are subject to change by Horace Mann and/or authorized third-party vendors as such are communicated to You from time to time.

C. All of the foregoing records identified in this Section 11 shall be open and available for inspection or audit at any time during normal agency hours with or without notice by the Company or its designated auditors and You shall have the duty to cooperate fully with the party(ies) making such inspection or audit.

D. All such documents identified in paragraph B of this Section 11 are and shall remain the property of the Company. These documents shall be maintained in accordance with the EA Standards and Guidelines and shall be provided to the Company upon termination of this agreement.

**12. Payments Collected By You**

If You receive any payments from customers or prospective customers in the performance of this Agreement, those payments are the property of the Company, will be treated as trust funds, and You will promptly transmit and report

such payments to the Company without deduction for any purpose in the manner specified by the Company and further defined and published from time to time, Failure to do so will constitute a breach under this Agreement..

**13. Remuneration**

A. The sole remuneration to which You will be entitled for services rendered pursuant to this Agreement will be the commissions set forth in the Commission Schedule, as may be amended by the Company in its sole discretion from time to time. The Company will pay You Your commissions at the time and in the manner set forth in the Commission Schedule. However, due to changing business conditions, the Company reserves the right to increase or decrease any commission amounts and to change the commission rules. If the Company changes commission amounts, it will provide You with written notice of the changes at least thirty (30) days prior to the date on which they are to become effective.

B. From time to time, the Company, in its sole discretion, may provide You with additional incentives based on performance.

C. If any application for insurance is rejected, or any policy is surrendered or canceled, in whole or in part, for any reason, before the expiration of the policy period, or if any premium is reduced or any overpayment is made to You, or if any premium paid is not earned by the Company, or if You have requested the Company perform services for You and the payment for those services is more than 60 days past due, then the commissions paid to You on the amount returned or credited to the policyholder, or the amount overpaid to You, or such past due sums will constitute an indebtedness of Yours to the Company and will be charged to You or recovered from You by reducing any future commissions, or incentives due You.

**14. Economic Interest in Policies**

Policies which are credited to Your book of business are described in the EA Standards and Guidelines. While this Agreement is in effect, the Company will leave in Your book of business all policies credited to Your book of business so long as the policyholder resides within a state in which You are licensed and appointed by Horace Mann, except the Company may remove any policy from Your book of business at the request of a policyholder.

**15. Transfer of Interest**

A. This Agreement is personal to You and is being entered into in reliance upon and in consideration of Your skill, qualifications, and representations. Accordingly, You may not execute a transfer of Your interest in this Agreement or any interest in the business under this Agreement, including but not limited to, any sale, assignment, conveyance or the granting of any lien, security interest, pledge, or mortgage thereof, without the prior written approval of the Company. A transfer of Your economic interest in this Agreement includes, but is not limited to, any sale, merger, or assignment of this Agreement or any rights or obligations under it.

B. You have an economic interest, as defined in this Agreement, in Your Horace Mann book of business. Subject to the terms and conditions set forth in this Agreement and in accordance with the procedures set forth in the EA Standards and Guidelines, You may transfer Your economic interest in the business under this Agreement upon termination of this Agreement by transferring the economic interest in the business to an approved transferee. The Company retains the right in its sole discretion to approve or disapprove such a transfer. Any failure to disclose and obtain the prior written approval of the Company for any transfer of Your interest in this Agreement or any interest in the business under this Agreement shall constitute a breach of this Agreement. The Company will not honor any proposed transfer of Your economic interest in this agreement unless the proposed transferee is approved by the Company.

C. Approval of a proposed transfer of Your interest in this Agreement will be conditioned upon the termination of this Agreement and the execution of a then current exclusive agent agreement by the approved transferee.

D. Policies in Your book of business and any applicable rights to termination payments will be transferred to the approved transferee.

E. [illegible] commissions classified as "renewals" are payable only to the original writing agent. [illegible] under management, which form the basis for annuity incentive commissions, are subject to transfer to the approved transferee.

**16. Termination of Agreement**

A. This Agreement will be terminated automatically:

1. On the effective date of any transfer, sale or assignment of interest of your corporation or limited liability company or cessation of services of the Key Agent as described in Section 3(I) or transfer or assignment of your economic interest in Your book of business as described in Section 15;

2. Upon Your death or permanent incapacity or if Your corporation or limited liability company is dissolved;

3. Upon Your loss of any required FINRA or resident insurance agent or producer license; or

4. Upon the Company's surrender of or the election not to renew its license to sell insurance in all lines in the state in which Your sales location is located or the Company's discontinuation of the sale of insurance in the state.

B. This Agreement may be terminated:

1. At any time by mutual agreement of the parties in writing;

2. By either party, with or without cause, or reason, upon providing sixty (60) days prior written notice to the other, or such greater number of days as is required by applicable law. Once written notice of termination has been given by either party, You will, immediately upon request of the Company, cease to act or to represent Yourself in any way as an agent or representative of the Company, but You will receive commissions pursuant to Section 13 from the Company for the period up to and including the specified termination date; or

3. Alternatively, by the Company, with cause, immediately upon providing written notice to You. Cause may include, but is not limited to, breach of this Agreement, including non-compliance with the EA Standards and Guidelines, fraud, forgery, misrepresentation, conviction of a crime, or any other action or omission which could materially harm the Company's business. The list of examples of cause just stated shall not be construed to exclude any other possible ground as cause for termination.

**17. Obligations Upon Termination of Agreement**

Except as otherwise provided in a subsequent agreement between You and the Company, upon termination of this Agreement, You agree:

A. You will not act or represent Yourself in any way as an agent or representative of Horace Mann.

B. You will immediately and completely return all property including but not limited to documents, hardware and software including any originals, copies, duplicates or facsimiles, belonging to Horace Mann, or dispose of such property in such manner as the Company specifies.

C. You will immediately cease to use such telephone numbers referenced in Section 5. You will be responsible for all charges incurred through the termination date.

D. For a period of twelve (12) months following termination, for any reason, You agree You will not solicit the purchase of products or services in competition with those sold by Horace Mann:

1. With respect to any person, company or organization to whom You or anyone acting on Your behalf sold insurance or other products or services on behalf of Horace Mann or an authorized third-party vendor and who is a customer of Horace Mann or an authorized third-party vendor at the time of Your termination.

2. With respect to any person, company or organization who is a customer of Horace Mann or an authorized third-party vendor at the time of termination of this Agreement and whose identity was discovered by You as a result of Your status as an EA or as a result of Your access to Confidential Information. From any office or business site located within ten miles of any locations from which You solicited or sold Horace Mann or authorized third-party vendors' products or services during the year immediately preceding termination of this Agreement.

In the event that such one-year period exceeds the time permitted by any applicable law, such period will be automatically adjusted to the maximum period permitted by such law. If any other provision of this paragraph

D conflicts with any existing law, including but not limited to distance, it will be applied to the extent permitted by such law.

E. You are responsible for the immediate return of all confidential information described in Section 7 of this Agreement and any other property to Horace Mann, in good condition, should this Agreement terminate for any reason. Any items not returned will be considered a liability and their value, if ascertainable, is hereby recoverable from any commissions due You or by direct payment from You to the Company when such commissions are insufficient.

F. You will immediately cease and desist from any and all use of Horace Mann service marks and trade names. You will immediately return to the Company all property in Your possession or under Your control bearing any Horace Mann service mark or trade name, or dispose of it in such manner as the Company specifies.

**18. Certain Remedies Upon Breach Of Obligations**

A. You recognize a breach of any of the provisions under Section 17 above will cause irreparable damage to the Company's business and such damage will be difficult or impossible to measure. You agree that in the event of any such breach, the Company, in addition to such other rights and remedies as it may have, will be immediately entitled to an order granting injunctive relief from any court of competent jurisdiction against any act which would violate any such provision, without the necessity of posting a bond, and You waive any defense to an application for such order, except that the violation did not occur. You agree the Company will be entitled to an award of reasonable attorneys' fees, legal interest as permitted by law and court costs in the event it is successful in an application for injunctive relief or in an action based upon breach of the foregoing provisions.

B. You recognize and acknowledge that each of the provisions of Section 17 above is reasonable and necessary to protect and preserve the legitimate business interests of Horace Mann, its present and potential business activities, and the economic benefits derived there from. You recognize and acknowledge the foregoing provisions will not prevent You from earning a livelihood and are not an undue restraint on You.

C. You further acknowledge and agree that if, at the time of enforcement of Section 17, a court shall hold the duration, scope, area or activity restrictions stated are unreasonable under circumstances and applicable law then existing, You and Horace Mann agree the maximum duration, scope, area or activity restrictions deemed by the court to be reasonable under such circumstances shall be substituted for the stated duration, scope, area or activity restrictions specified in this Agreement.

**19. Notice**

All notices will be deemed to have been given if personally delivered, sent by facsimile transmission, or mailed as follows:

| | |
|---|---|
| if to the Company: | **ABM Service Corporation**<br>1 Horace Mann Plaza<br>Springfield, IL 62715<br>Attention: Vice President, National Sales |
| if to You: | Your last known address on file with the Company |

or to such other person or address as any party may furnish or designate to the other in writing.

**20. Governing Law - Venue For Claims**

A. This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois.

B. Actions brought by You arising out of or related to this Agreement shall be brought in a state or federal court having jurisdiction located in Springfield, Illinois. Such actions brought by the Company shall be brought, at the discretion of the Company, in a state or federal court located in Springfield, Illinois; Your state of residency; or any other forum in which You are subject to personal jurisdiction. You specifically consent to personal jurisdiction in the State of Illinois for such purposes and acknowledge that the selected forum of Springfield, Illinois is not burdensome and is the location of the execution of this Agreement.

**21. General Provisions**

A. This Agreement is the sole and entire agreement between the Company and You, and it supersedes and replaces any prior employment, agency, or other agreement between the Company and You. This Agreement also supersedes any prior oral statements and representations by the Company to You and any prior written statements and representations by the Company to You in letters, manuals, booklets, memoranda, or any other format.

B. This Agreement may not be modified except by a written agreement between the Company through an authorized representative and You which expressly states it modifies this Agreement. No other written statements, representations, or agreements and no oral statements, representations, or agreements will be effective to modify this Agreement. No representative of the Company will have authority to modify this Agreement except as provided in this Section 21. Nothing in this Section will affect the Company's right to amend the EA Standards and Guidelines and Commission Schedule as provided in this Agreement.

C. This Agreement includes Exhibits A thru E which include the EA Standards and Guidelines (Exhibit C) and Commission Schedule (Exhibit D).

D. You acknowledge You have reviewed the EA Standards and Guidelines and Commission Schedule and You have an ongoing responsibility to review all changes to the EA Standards and Guidelines and Commission Schedule issued by the Company and agree to be bound by them.

E. References in this Agreement to the EA Standards and Guidelines and Commission Schedule include changes which may be made from time to time and distributed to You by the Company, including such being available on the Company's Intranet site.

F. You acknowledge You have read this Agreement, understand it, and agree to be bound by its terms.

G. The descriptive headings of this Agreement are intended for reference only and will not affect the construction or interpretation of this Agreement.

H. If any provision or part of this Agreement is held invalid for any reason, such invalidity will not affect any other provision or part of this Agreement not held invalid, and such remaining provisions and parts will remain in full force and effect.

I. The failure of either party to insist upon the performance of any of the terms of this Agreement in any one or more instances will not be construed as a waiver or relinquishment of the future performance of any such term. The obligation of the parties with respect to any such future performance will continue in full force and effect.

J. Nothing in this Agreement shall be construed to confer upon any person or entity other than Horace Mann and You any rights under this Agreement.

K. This Agreement, and the obligations or rights hereunder, shall not be assignable by You, except as provided by Section 15. The rights and obligations of the parties to this Agreement shall be binding upon and inure to the benefit of the Company and its successors and assigns or legal representative.

L. This Agreement may be executed in counterparts, each of which will be deemed an original.

## Amendment to ABM Service Corporation Exclusive Agent Agreement

### Amendment 1

This Amendment is attached to and incorporated into the ABM Service Corporation Exclusive Agent Agreement. This Amendment modifies the timeframe to provide written notice regarding termination of the agreement (Section 16.B.2. - Termination of Agreement). ABM Service Corporation, may modify, add to, delete or otherwise change this Amendment in its discretion from time to time.

### Amendment 2

This Amendment is attached to and incorporated into the ABM Service Corporation Exclusive Agent Agreement. This Amendment modifies the timeframe for termination of the agreement in instances of death or permanent incapacitation (Section 16.A.2. – Termination of Agreement) and the potential for termination of your Agreement in the loss of a FINRA or required resident insurance agent or producer license (Section 16.B.2. – Termination of Agreement). ABM Service Corporation may modify, add to, delete or otherwise change this Amendment in its discretion from time to time.

- Section 16. Termination of Agreement is deleted in its entirety and replaced with following new section.

16. Termination of Agreement

A. This Agreement will be terminated automatically:

1. On the effective date of any transfer, sale, dissolution or assignment of interest of your corporation or limited liability company or cessation of Your services as described in Section 3(I) or transfer or assignment of Your economic interest in Your book of business as described in Section 15;
2. Ninety (90) days from Your death or permanent incapacitation or such other timeframe as mutually agreed upon in writing with your agency;
3. Upon Your loss of any required FINRA or resident insurance agent or producer license;
4. Upon the Company's surrender of or the election not to renew its license to sell insurance in all lines in the state in which Your sales location is located or the Company's discontinuation of the sale of insurance in the state.

B. This Agreement may be terminated:

1. At any time by mutual agreement of the parties in writing;
2. By either party, with or without cause, or reason, upon providing ninety (90) days prior written notice to the other, or such greater number of days as is required by applicable law. Once written notice of termination has been given by either party, You will, immediately upon request of the Company, cease to act or to represent Yourself in any way as an agent or representative of the Company, but You will receive commissions pursuant to Section 12 from the Company for the period up to and including the specified termination date; or
3. Alternatively, by the Company, with cause, immediately upon providing written notice to You. Cause may include, but is not limited to, breach of this Agreement, including non-compliance with the EA Standards and Guidelines, fraud, forgery, misrepresentation, conviction of a crime, or any other action or omission which could materially harm the Company's business. The list of examples of cause just stated shall not be construed to exclude any other possible ground as cause for termination.

IN WITNESS WHEREOF, this Agreement and the attached Exhibits are effective on ________________ and the Company has caused this Agreement to be executed by its authorized representative and You hereby accept the terms of this Agreement.

ABM Service Corporation

[signature]

Rick Schulenburg, Vice President National Sales

______________________________
(Date)

YOU

[signature]
______________________________
(Signature)

John Berkhoff
______________________________
(Print name)

2/22/12
______________________________
(Date)